## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| CHRIS WILLIAMS , ASHOK PATEL, KENNETH GAGNON, MICHAEL CERNY, ERHAN ARAT, ANDRE MALSKE, CRAIG LASH and NICOLE GUY, on behalf of themselves and the Putative Class<br><br>Plaintiffs,<br><br>v.<br><br>BMW OF NORTH AMERICA, LLC and BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT,<br><br>Defendants. | Case No.<br><br><br><br>Civil Action<br><br>CLASS ACTION COMPLAINT AND JURY DEMAND |

Plaintiffs, by their attorneys, Nagel Rice LLP, on behalf of themselves and all others similarly situated, make the following allegations on personal knowledge and information and belief:

### I.    IDENTIFICATION OF PARTIES
### (Local Rule 10.1)

1.    The names and addresses of the named parties to this action are (i) Chris Williams, 4 Carol Terrace, Warren, New Jersey 07059; (ii) Ashok Patel, 4 Payne Court, Edison, New Jersey 08820; (iii) Kenneth Gagnon, 297 Theresa Street, Fitchburg, Massachusetts 01420; (iv) Michael Cerny, 114 Preserve Place, Lewisville, Texas 75067; (v) Erhan Arat, 41 Cedar Walk Unit 4314, Long Beach, California 90802; (vi) Andre Malske,  N61W27281 Trappers Run, Sussex, Wisconsin 53089-4704; (vii) Craig Lash,  4315 N. Shasta Loop, Eugene, Oregon 97405; (viii) Nicole Guy, 303 Sunset Drive,

East Syracuse, New York 13057; (ix) BMW of North America, LLC, 300 Chestnut Ridge Road, Woodcliff Lake, New Jersey 07677; (x) Bayerische Motoren Werke Aktiengesellschaft, BMW Hochhaus, Petuelring 130, Munich, Germany.

## II.  <u>NATURE OF THE ACTION</u>

2.   Plaintiffs bring this action for actual damages, equitable relief, including restitution, injunctive relief, and disgorgement of profits, and all other relief available on behalf of themselves and all similarly-situated individuals (the "Class") and entities who own, lease or have owned or have leased model year 2012 through 2015 BMW vehicles with the N20 and N26 direct injection turbocharged engine, including E84, E89, F10, F25 and F30 vehicles (hereinafter, the "Class Vehicles") manufactured and/or sold by the Defendants, BMW of North America, LLC ("BMW-NA") and Bayerische Motoren Werke Aktiengesellschaft("BMW-AG")(hereinafter collectively, "BMW" or "Defendant").

3.   All of the claims asserted herein arise out of BMW's design, manufacture, and warranting of the Class Vehicles, as well as BMW's advertising, promoting, marketing, distributing, selling and leasing of the Class Vehicles as one of the most dependable, safe, and reliable vehicles available. Indeed, BMW touts itself as the manufacturer of "the ultimate driving machine." In this case, class members have been left with a machine that ultimately will not drive!

4.    The Class Vehicles are designed and manufactured with two uniform and inherent design defects (which shall be jointly referred to below as the "Defect"). All of the Class Vehicles are equipped with engines containing two separate internal components that are prone to failure, resulting in at best, poor performance and limited ability to accelerate, and at worst, sudden catastrophic engine failure. These components are known as the primary and secondary chain assemblies.

5.    The primary chain, often called the timing chain, connects and synchronizes the camshafts and crankshaft and causes the valves in the engine's combustion chambers to open and close. When the primary chain assembly fails the teeth on the chain sprockets skip and the camshafts and crankshaft fall out of synchronization. Because the primary chain plastic guide assembly is made primarily of a defective polycarbonate composition it becomes brittle and breaks apart, lodging in the crankshaft drive sprockets and causing the chain to break or skip and damage or destroy the engine.

6.    The secondary chain connects the oil pump and balance shaft assemblies to the crankshaft. This assembly is also defective and fails prematurely because the materials and design are made of insufficient materials that are unable to prevent high resistance wear. This results in premature elongation of the chain, damage to the chain sprocket and chain slippage.

3

7.    The chances of catastrophic engine failure have been exacerbated by the lengthy time between engine oil change intervals during most of the class period, and the lack of any requirement in the owner's manual and service and warranty information booklet that the primary and secondary chain assemblies be inspected or maintained in any way when the vehicles are brought in for service. Indeed, the service and warranty information for Class Vehicles includes a maintenance schedule that extends to 150,000 miles but there is no recommendation that the primary or secondary chains be maintained or replaced during this entire time frame.

8.    Clearly these are not parts that the Defendant or the Class Vehicle purchasers anticipate breaking during the expected useful life of the Class Vehicles.  However, as will be detailed below in the discussion of the experiences of the named Plaintiffs, the primary and secondary chain assemblies routinely fail long before their reasonably expected useful life resulting in, at best expensive repairs if caught in time, or catastrophic engine failure requiring the total replacement of the engine.

9.    This Defect is inherent in the design and/or manufacture of the Class Vehicles' primary and secondary chain assemblies. As a result of the Defect, Plaintiffs and the other members of the Class have been subject, and continue to be subject, to a serious safety risk, as they are subject to sudden and catastrophic engine failure which can occur at any time.

4

10.  Defendant knew or should have known before the time it sold the first Class Vehicle, that the Class Vehicles contained the Defect. Defendants had sole and exclusive possession of this knowledge at or before the time it sold the first Class Vehicle, at the time it made repairs outside the warranty and charged consumers for those repairs, and continues to remain in sole and exclusive possession of virtually all information regarding the Defect.

11.  Defendant concealed and failed to disclose the Defect, both at the time of sale or lease of the Class Vehicles either as new or certified pre-owned vehicles and on an ongoing basis, including but not limited to when the Class Vehicles were brought in for service. The Defect exposes drivers and occupants of the Class Vehicles, as well as others who share the road with them, to an increased risk of accident, injury, or death.

12.  At all times, Defendant concealed from and/or failed to disclose to Plaintiffs, the other members of the Class and all others in the chain of distribution, the Defect, and failed to remove the Class Vehicles from the marketplace or take appropriate remedial action. Instead, Defendant sold and serviced the Class Vehicles, and continue to sell and service the Class Vehicles, even though it knows and knew, or was reckless in not knowing, that the Class Vehicles contained the Defects, and that such failure would ultimately result in the inability of Plaintiffs and

the other members of the Class to use their vehicles for their intended purpose during the time Plaintiffs and the other members of the Class reasonably expected they would have use of their vehicles, and subjected Plaintiffs and the other members of the Class to an increased risk of accident, injury, or death.

13. Defendant omitted material information regarding the Defects from its marketing, advertising, sale, and lease of the Class Vehicles. The Defect exposes drivers and occupants of the Class Vehicles, as well as others who share the road with them, to an increased risk of accident, injury, or death.

14. At all times, Defendant omitted from Plaintiffs and the other members of the Class, and all others in the chain of distribution, the existence of the Defect and failed to remove the Class Vehicles from the marketplace or take appropriate remedial action. Instead, Defendant sold and serviced the Class Vehicles, and continue to sell and service the Class Vehicles, even though it knows and knew, or was reckless in not knowing, that the Class Vehicles contained the Defect, and that such Defect would ultimately result in the inability of Plaintiffs and the other members of the Class to use their vehicles for their intended purpose during the time Plaintiffs and the other members of the Class reasonably expected they would have use of their vehicles, and subjected Plaintiffs and the other members of the Class to an increased risk of accident, injury, or death.

15.  The Defect has caused the Class Vehicles to fail prematurely, whether within or outside of the applicable warranty periods.   Attempted repairs to Plaintiffs' vehicles have continually failed or can only be accomplished through the total replacement of the engine which may cost upwards of $22,000 and make no economic sense in many instances.

16.  Many other owners and lessees of the Class Vehicles have complained in public forums and to BMW-NA dealerships about the Defects and the specific problems it causes, and have requested that Defendant address and remedy the Defect.

17.  The extensive number of warranty claims involving the timing chain assemblies, customer complaints, field investigations, communications with dealers and service technicians, discussions in on-line forums, several redesign attempts and the fact that the identical timing chain components in predecessor models had experienced failure establish that BMW knew of the Defect by late 2012.

18.  Despite knowledge of the Defect in late 2012, BMW concealed this information from the public and placed and continued to place the Class Vehicles in the stream of commerce knowing that class members would be adversely affected.

19.  Even though BMW had knowledge of the Defect in 2012, it omitted this information and did not inform its customers or dealers about the problem.

7

20.  As a direct and proximate consequence of BMW's active and ongoing concealment and omission of the Defect, Plaintiffs and the other members of the Class purchased, leased, and currently own or lease defective vehicles and have incurred damages thereby.

21.  Had Plaintiffs and other members of the Class known of the Defect at the time of purchase or lease, they would not have bought or leased their vehicles, or would have paid substantially less for them.

22.  Plaintiffs seek actual damages, injunctive relief, restitution and/or disgorgement of profits, statutory damages, attorneys' fees, costs, and all other relief available to Plaintiffs and the Class.

### III. <u>PARTIES</u>

23.  Plaintiff Chris Williams is a New Jersey citizen who resides in Warren, New Jersey.

24.  Plaintiff Ashok Patel is a New Jersey citizen who resides in Edison, New Jersey.

25.  Plaintiff Kenneth Gagnon is a Massachusetts citizen who resides in Fitchburg, Massachusetts.

26.  Plaintiff Michael Cerny is a Texas citizen who resides in Lewisville, Texas.

27.  Plaintiff Erhan Arat is a California citizen who resides on Long Beach, California.

28. Plaintiff, Andre Malske is a Wisconsin citizen who resides in Sussex, Wisconsin.

29. Plaintiff Craig Lash is an Oregon citizen who resides in Eugene, Oregon.

30. Plaintiff Nicole Guy is a New York citizen who resides in East Syracuse, New York.

31. Defendant BMW of North America, LLC ("BMW-NA"), is a limited liability company, organized and in existence under the laws of the state of Delaware with corporate headquarters located at 300 Chestnut Ridge Road, in Woodcliff Lake, New Jersey. BMW is the distributor and warrantor of the Vehicles in the United States.

32. Defendant Bayerische Motoren Werke Aktiengesellschaft ("BMW-AG") is a duly organized German corporation with its headquarters in the city of Munich, Germany. BMW-AG is the parent company of BMW-NA.

33. At all relevant times, Defendant was engaged in the business of marketing, advertising, distributing, selling, and warranting automobiles, other motor vehicles and motor vehicle components in New Jersey and throughout the United States of America. BMW-NA sells and distributes vehicles that it manufactures, as well as vehicles manufactured by BMW-AG and has a network of more than 338 independently-owned dealerships throughout the USA. BMW-NA drafted and published the owner's manual and Service and Warranty Information materials and acts as the

warrantor of vehicles constructed by both Defendants which are sold in the USA.

34.    There exists at all times relevant hereto, a unity of ownership between BMW-NA, BMW-AG and their agents, such that any individuality or separateness between them has ceased and each is the alter ego of the other. BMW-AG communicates with BMW-NA concerning virtually all aspects of the products distributed within the USA.

**Plaintiffs' Experiences**

35.    In 2015, Williams purchased a pre-owned 2013 BMW X3 28i from Springfield BWM in Springfield New Jersey for approximately 27,000.

36.    Prior to his purchase, Williams spoke to the salesman at the dealership regarding the vehicle. The salesman at Springfield BMW touted the benefits of the vehicle, its great reviews, good fuel economy and the safety of the all-wheel drive. No issues or problems were disclosed to him.

37.    None of the representations received contained any disclosure related to the Defects. Had BMW disclosed that this vehicle contained the Defect, Williams would not have purchased the vehicle, or would have paid significantly less for the vehicle.

38.    On October 12, 2017, when the vehicle had 83,000 miles, Williams heard a sudden knocking noise coming from the engine bay followed by a no start condition disabling the vehicle in his

10

driveway. Upon inspection through the oil cap there were noticeable scoring marks on the timing chain and it was physically loose. His car had to be towed to a specialized shop for evaluation and to date Williams has spent $7,000 having a used engine put in the vehicle.

39.  On November 16, 2014, Patel purchased a 2012 BMW 528 XI from Starz Tech Auto, in Manheim, Pennsylvania for approximately $32,000.  The vehicle had 37,000 miles on it at the time of purchase and so the car was still under the original BMW warranty. Prior to his purchase of the vehicle, Patel reviewed BMW advertising and researched the model he purchased on the web and was impressed with the information he obtained regarding the dependability, reliability and safety of the 2012 528XI.

40.  Patel received no disclosure relating to the Defect. Had Patel known of the Defect he would not have purchased the vehicle or would have paid significantly less for the vehicle.

41.  On July 28, 2017, when the vehicle had 72,755 miles Patel brought his vehicle in to BMW of Springfield because he was hearing a whining noise coming from the engine while driving and accelerating.  The Service Department diagnosed the cause of the problem as the oil pump timing chain being worn and indicated in the description of their repairs that when they drained the oil they "found pieces of chain guide material." The parts and labor for the repairs cost $3,766 plus tax, but as a courtesy BWM paid

half the costs, so that Patel was out of pocket $1,768.08 for the repairs.

42.   On or about June 23, 2014, Gagnon purchased a demo 2013 BMW 328i having 13,000 miles from BMW of Shrewsbury in Massachusetts for $36,000.

43.   Gagnon purchased his vehicle primarily for personal, family, or household use.  Among other things, the safety and reliability of Gagnon's vehicle was of paramount importance. Prior to his purchase of the vehicle at issue, the dealer's salesman specifically told Gagnon how solid and reliable the car was which influenced his decision to purchase the car.  None of the representations made to Gagnon by BWM of Shrewsbury contained any disclosures related to the Defect.  Had BMW disclosed that this vehicle actually contained the Defect, Gagnon would not have purchased his vehicle, or would have paid significantly less for the vehicle.

44.   On August 25, 2017, when the vehicle had 80,000 miles, shortly after the 75,000 mile extended warranty that Gagnon purchased from BMW expired, Gagnon's car broke down and had to be towed to the dealer. Gagnon was advised that the timing chain guard broke causing the engine to be ruined and had to be replaced. He was quoted a retail price of $21,593.20 to replace the engine, but he was given a 'goodwill' discount and charged $8,229.55 for the engine replacement.

45.   On June 7, 2016, Cerny bought a pre-owned 2012 328i from BWM Dallas for approximately $17,000.

46.   At the time of purchase the car had 85,000 miles on it and he was concerned about purchasing such a high mileage car. The salesman, Sheik Mobeen, touted the quality and reliability of the car, indicating that BMW's are "made to last" have "quality engineering" and are "one of the most reliable brands in the world." No issues or problems with this vehicle or the N20s were disclosed to him.

47.   Cerny's son did considerable research online about the car and saw that BMW was representing that this was the first year that BMW was using a turbo charged 4 cylinder engine instead of the inline 6 which resulted in better gas mileage and efficiency. This new engine was touted as better than previous year models which was an important selling point for Cerny.

48.   None of the representations received by Cerny contained any disclosure relating to the Defects.  Had BMW disclosed that this vehicle contained the Defects, Cerny would not have purchased the vehicle, or would have paid significantly less for the vehicle.

49.   On June 30, 2017, when the vehicle had 104,000 miles, the car stalled in flight and the drive train warning light came on. It was determined when brought in for service that there was slack in the timing chain and the timing chain and oil pump drive

had to be replaced. He had these repairs made at a cost to him of $2,964.70.

50.  In June 2015, Arat purchased a used 2012 F30 328i for approximately $24,400 from a used car dealer in Costa Mesa, California.

51.  Arat had researched the model extensively prior to making his purchase and the reviews and BMW literature indicated that the vehicle was superior to other models: safer, better gas mileage and more horsepower. Had BMW disclosed that this vehicle contained the Defects, Arat would not have purchased the vehicle, or would have paid significantly less for the vehicle

52.  On October 21, 2017, when the vehicle had 87,000 miles on it, Arat brought it in to be serviced for an open recall on the turbo oil live at Long Beach BMW. While there, the service technician advised him that the timing chain was making noise and likely to fail soon. He was quoted a price of $4,000 plus tax to make these repairs necessary to avoid imminent engine failure. After having repairs made he was out of pocket $400 for the repairs and $100 for the cost of a rental car while the repairs were being made.

53.  In April 2013, Malske bought a brand new 2013 BMW X3 xDrive 28i which was special ordered from the factory from BMW Motorwerks of Barrington, Illinois for $44,273. The vehicle came with a standard 4 year/50,000 mile warranty.

54.   Prior to his purchase Malske conducted research by reviewing Consumer Reports and reading the BMW literature available online. He was impressed that Consumer Reports ranked BMW X3 as the best luxury SUV at that time and that the car came with a 4 year/50,000 mile warranty which included maintenance. The 2013 Model year was the first year with the N20 2.0 Turbo engine which recommended better fuel economy than the previous 6-cylinder engine. He also relied upon BWM's marketing which touted its reliability and dependability.

55.   None of the representations received by Malske contained any disclosure relating to the Defects. Had BMW disclosed that this vehicle contained the Defects, Malske would not have purchased the vehicle, or would have paid significantly less for the vehicle.

56.   On August 13, 2017, when the vehicle had approximately 79,000 miles Malske was driving the vehicle when he received a "Stop engine: check oil pressure!" message and then a second message stating: "Drivetrain Malfunction. Drive Moderately, Maximum Drivetrain Output Not Available." Upon examination by the technician it was determined that there were particles in the engine and an engine replacement was recommended. BMW contributed 35% to the cost but Malske was out of pocket approximately $10,000.

57.   In or around April 2013, Lash purchased a new 2013 X3 from BMW of Portland for approximately $50,000. His vehicle came with the standard 4 year 50,000 mile warranty.

15

58.   Prior to his purchase, Lash did extensive comparison research and concluded based upon this research and the BMW marketing materials that the vehicle he selected would be more reliable, have better fuel economy and more capacity than similar vehicles produced by the other manufacturers. At the time when he purchased the vehicle the salesman at BMW of Portland did not advise him of any issues or problems with the vehicle.

59.   None of the representations received by Lash contained any disclosure relating to the Defects. Had BMW disclosed that this vehicle contained the Defects, Lash would not have purchased the vehicle, or would have paid significantly less.

60.   In August 2017, after he owned the vehicle for more than four years but when the vehicle had only 45,000 miles, the timing chain experienced a complete failure and the engine had to be replaced. BMW agreed to cover 80% of the cost of the new engine, so that Lash was out of pocket $3,045.

61.   In or around February 2013 Guy originally leased a 2013 X3 328i xdrive from Burdick BMW for $45,276 and bought out the lease three years later for approximately $27,000. The vehicle came with a standard 4 year/50,000 mile warranty.

62.   Prior to her purchase, Guy relied upon BMW advertising and sales promotions which touted BMWs as "the ultimate driving experience" as well as the representations that the car would be

a dependable and reliable vehicle. No issues or problems were disclosed to her at the Burdick dealership.

63.   None of the representations received by Guy contained any disclosure relating to the Defect. Had BMW disclosed that this vehicle contained the Defect, Guy would not have purchased the vehicle, or would have paid significantly less for the vehicle.

64.   On June 9, 2017, when the vehicle had 85,000 miles, Guy was driving 60 mph when the drivetrain malfunction notification came on and the vehicle began to lose power. It started shaking, the oil pressure warning came on and the vehicle died. The dealer determined that the car was experiencing the Defect and indicated that it would cost $18,000 to replace the engine. BWM offered no assistance towards that cost so she sold the vehicle to a different company at a substantial loss and had to purchase a new vehicle.

65.   At all times, Plaintiffs and the other members of the Class drove their vehicles in a foreseeable manner, and in the manner in which they were intended to be used.

66.   Plaintiffs and the Class have suffered an ascertainable loss as a result of the Defendant's omissions associated with the Defect, including but not limited to, out-of-pocket losses and diminished value of the vehicles.

67.   Were Plaintiffs and the other members of the Class aware of the concealments, failures to disclose and omissions described

herein, they would not have purchased their vehicles or would have paid significantly less for them.

## IV. <u>JURISDICTION AND VENUE</u>

68. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d)(2), as the Class contains more than 100 members, at least one of whom maintains citizenship in a state diverse from Defendant, and seeks in the aggregate more than Five Million Dollars ($5,000,000.00), exclusive of costs and interest. This Court also has personal jurisdiction over the parties because Defendant conducts substantial business in New Jersey, its corporate headquarters is located in New Jersey, and has had systematic and continuous contacts with New Jersey, and has agents and representatives that can be found in this State.

69. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Plaintiff Patel and Williams and Defendant BMW-NA are residents of this judicial district, a substantial part of the events giving rise to the claims set forth herein occurred and emanated from this district, and Defendant's conduct has injured members of the Class residing in this district. Accordingly, this Court has jurisdiction over this action, and venue is proper in this judicial district.

## V. <u>NEW JERSEY LAW APPLIES</u>

18

70. It is appropriate to apply New Jersey law to the nationwide claims because New Jersey's interest in this litigation exceeds that of any other state.

71. New Jersey's substantive laws may be constitutionally applied to the claims of Plaintiffs and the Class under the Due Process Clause of the 14th Amendment, Section 1, and the Full Faith and Credit Clause, Article IV, Section 1 of the United States Constitution. New Jersey has significant contacts to the claims asserted by Plaintiffs and all Class members, and thereby creates state interests that ensure that the choice of New Jersey state law is not arbitrary or unfair.

72. BMW-NA headquarters is located in New Jersey and is the sole entity in the contiguous 48 states of the U.S. responsible for distributing, selling, leasing and warranting BMW vehicles.

73. The Woodcliff Lake facility handles customer relations, engineering, marketing, the warranty department and the technical training center. Customer complaints are fielded from New Jersey as is the monitoring of consumer complaints posted to both BMW and third party web-sites.

74. BMW's warranty and engineering departments are responsible for concealing the Defects from Class Members and for instituting policies to deny warranty coverage to those who experience engine failure caused by the Defect.

75. BMW has a vehicle preparation center in Port Jersey, New Jersey where BMW inspects and prepares vehicles for distribution throughout the United States.

76. BMW owns property in New Jersey, conducts substantial business in New Jersey and avails itself of New Jersey's laws. BMW's SAV Center Agreement expressly provides that it is to be construed under New Jersey law. See relevant pages annexed as Exhibit A. Thus New Jersey has an interest in regulating Defendant's conduct under its laws rendering the application of New Jersey law to all claims asserted herein to be constitutionally permissible.

### VI.  TOLLING OF STATUTE OF LIMITATIONS

77. Any applicable statute(s) of limitations has been tolled by BMW's knowing and active concealment and denial of the facts alleged herein. Despite their due diligence, Plaintiffs and the other members of the Class could not have reasonably discovered the Defect until shortly before this class action litigation was commenced.

78. BMW was and remains under a continuing duty to disclose to Plaintiffs and the other members of the Class the true character, quality and nature of the Defect, that the Defect will require costly repairs and/or engine replacement, that the Defect affects internal engine parts, that the Defect poses a safety concern, and that the Defect diminishes the resale value of the

Class Vehicles. As a result of the active concealment by BMW, any and all statutes of limitations otherwise applicable to the allegations herein have been tolled.

79.  Moreover, because the Defect could not be detected due to BMW's purposefully fraudulent concealment, Plaintiffs and the other members of the Class were not reasonably able to discover the Defect until long after purchasing or leasing the Class Vehicles, despite their exercise of due diligence. Thus, the discovery rule is applicable to the claims asserted by Plaintiffs and the other members of the Class.

80.  Any applicable statute of limitation has therefore been tolled by BMW's knowing, active concealment and denial of the facts alleged herein. BMW is estopped from relying on any statutes of limitation because of its concealment of the Defect.

### VI.  <u>FACTUAL BACKGROUND</u>

A. <u>The Class Vehicles & The Defect</u>

81.  The Class Vehicles experiencing the Defect are the vehicles with the BMW N26 and BMW N20 engines. The BMW N26 is a turbocharged straight-4 gas engine produced from 2012 to 2016. The BMW N20 engine is also a turbocharged straight-4 DOHC gas engine which replaced the N52/N53 and has been in production since 2011.

82.  The Class Vehicles are defective with respect to the primary and secondary chain assemblies causing premature

catastrophic engine failure. The primary chain assembly consists of the camshaft and crankshaft sprockets, primary timing chain, hydraulic chain tensioner, tensioning rails and chain rails. The secondary chain assembly is made up of the crankshaft and counterbalance shaft sprockets, oil pump drive chain, chain tensioner and integrated guide and tensioner rails.

83.   The primary chain plastic guide assemblies are made of defective polycarbonate composition resulting in their becoming brittle and breaking apart, often lodging in the crankshaft drive sprockets causing chain breakage or skipping. The Defendant has redesigned parts of the primary chain assembly multiple times to increase piston travel, provide a longer housing and a stronger internal spring. The original primary chain tensioner was assigned part number 11317567680 while the revised design had part number 11318685091.

84.   Either scenario poses serious safety concerns since there can be a loss of engine power during operation without any warning, as well as reduced breaking and loss of power steering caused by a lack of engine vacuum. The drive wheels will lock causing loss of directional stability and steering in those vehicles equipped with manual transmissions. Alternatively, the engine may fail to start unexpectedly.

85. With respect to the secondary chain in the Class Vehicles, which connects the oil pump and balance shaft assemblies

to the crankshaft, the use of insufficient materials results in premature chain elongation, chain sprocket damage and chain slippage.

86. Initially redesigned in late 2014 the secondary chain now incorporates a solid center link plate[1].

87. Defendant increased the risk of the Defect manifesting itself by maintaining a 15,000 mile 24 month oil change interval until the 2014 models were introduced. That lengthy interval made it unlikely that a service technician would uncover the deterioration of the primary and secondary timing chains until it was too late to catch with a repair, increasing the number of catastrophic engine failures.

B. The Reasonable And Legitimate Expectations Of Plaintiffs And The Members Of The Putative Class

88. Customers purchasing or leasing vehicles reasonably and legitimately expect that those vehicles, like the Class Vehicles at issue herein, will properly function for years.

89. In purchasing or leasing their vehicles, Plaintiffs and the other members of the Class reasonably and legitimately expected their vehicles to be reliable, and to operate in accordance with all of their intended purposes – including not having their engines fail requiring total replacement.

---

[1] The secondary chain has been redesigned twice and assigned parts numbers 11417602646 (original part), 11417605366, and 11418651102.

90.   In purchasing or leasing their vehicles, Plaintiffs and the other members of the Class reasonably and legitimately expected that the Class Vehicles would be free from the Defect.

91.   The existence of the Defect is a fact that would be considered material to a reasonable consumer deciding whether to purchase or lease an expensive BMW vehicle. Particularly since BMW touts its vehicles as lasting a long time, provides service recommendations through 150,000 miles of use, and never indicates that the primary or secondary chain assemblies will need replacement during that entire time frame.

92.   Customers like Plaintiffs and the other members of the Class, reasonably and legitimately expect and assume that a vehicle's engines will function in their intended manner, will not pose a safety hazard, and are free from defects. Plaintiffs and the other members of the Class also reasonably and legitimately expect and assume that Defendant will not sell or lease vehicles with a known defect, will disclose any such defects to consumers when they learn of them, and take all steps to remedy any defect in a manner that does not cause additional cost to the customer. It was reasonable and legitimate for Plaintiffs and the other members of the Class to expect BMW not to actively and intentionally conceal problems from them – such as the Defects described herein, to continually deny its existence, and refuse

24

to bear the repair costs that become necessary to correct the problems resulting from the Defect.

93.  Throughout the period that the Class Vehicles were sold and leased, BMW marketed, promoted and advertised the Vehicles as reliable, safe, fuel efficient and "the ultimate driving machine."

94.  Plaintiffs and the other members of the Class reasonably and legitimately expected BMW to disclose the existence of the Defects and that the Vehicles were prone to premature engine failure due to faulty primary and secondary chain assemblies that were known to BMW at the time of sale or lease, or when the vehicle was brought in for repairs and owners/leases complained of certain noises, which are indicative of the issues.

95.  Plaintiffs and the other members of the Class could not have discovered the latent Defect through any reasonable inspection of their vehicles prior to purchase or at any time thereafter.

96.  As a consequence of BMW's exclusive knowledge and concealment about the Defect, BMW owners will not discover the problem until after warranty coverage has passed.

97. As a direct and proximate result of the Defect, Plaintiffs and the other members of the Class have experienced failure of their vehicles, did not receive what they paid for, and have incurred actual damages.

98. Had Plaintiffs and other members of the Class known about the Defect while they were in the market for purchasing or leasing a vehicle, they would not have purchased or leased the Class Vehicles or, at the very least, would have paid less for them particularly due to the increased risk of accident, injury or death.

C. **Defendant's Awareness Of The Defect**

99. Plaintiffs allege that at all relevant times, specifically at the time they purchased or leased their vehicles and when their vehicles were brought in for service, Defendant knew of the Defect and the safety dangers of the Defects. **BMW was under a duty to disclose the Defect based upon its exclusive knowledge of and/or concealed material information regarding the Defect; BMW failed to disclose the Defect to Plaintiffs, other Class members, or the public at any time or place or in any manner such that it could (and would) have affected Plaintiffs' and other class members' pre-sale decision to purchase and/or lease the Class Vehicles.**

100. **BMW obtained knowledge of the Defect no later than late 2012 as evidenced by that fact that they began to redesign the chain tensioner without revealing the problem to class members. Indeed, there have been five redesigns of the chain assemblies for the engines in the Class Vehicles dating back to 2013 and in some instances the parts were used for less than one model year.**

26

Clearly, BMW was aware of a problem with these vehicles before 2013 since it takes time to redesign parts.

101. In February 2017 BMW finally released a Technical Service Bulletin ("TSB") to address the Defects in the Vehicles chain assemblies. TSB S1B110317 indicated the symptoms associated with the defective engine chain assemblies as "N20 AND N26 ENGINE: HIGH PITCHED WHINING NOISE FROM LOWER ENGINE AREA caused by wear on the engine oil pump chain drive sprockets." The fix set forth in the TSB is to replace "the engine oil pump drive chain module, timing chain, timing chain tensioner, slide rail, tensioning rail and guide rail." (See Exhibit B)

102. Although this TSB was not issued until 2017, given that there were several previous attempts to redesign these parts, the extensive complaints on numerous websites monitored by BMW, including BMW's own online "bimmerpost" forum, as well as complaints posted on the database maintained by the National Highway Traffic Safety Administration which BMW was clearly aware of and which included numerous complaints charging that the N20/N26 chain defect posed an unreasonable safety hazard, it is plain that Defendant knew of the Defect at the time when Plaintiffs and the class members purchased or leased their Class Vehicles.

103. Defendant also knew, or reasonably should have known, of the Defect based upon the number of complaints it received from its dealerships and service shops. For instance, multiple

departments at BMW interact with its dealerships and service shops in order to identify potentially widespread vehicle problems. These departments collect and analyze data from the dealerships and service shops in order to identify any problems in its vehicles.

104. BMW requires its dealerships to sign a BMW of North America, Inc. SAV Center Agreement that set forth what the dealership needs to provide to BMW.  See relevant portions as Exhibit A.

105. Pursuant to BMW's Agreement, the dealerships are required to provide BMW with access to all the service and warranty service records for repairs made by the individual dealerships. See Id. The Agreement establishes that BMW requires its dealerships to have a computer system that serves as BMW's primary link to the dealership, including for parts, ordering, warranty claims, filing of reports, etc. Id.

106. Further, BMW's customer relations division regularly receives and responds to customer calls, emails, and other correspondence concerning, *inter alia*, product defects. Through these sources, BMW was made aware, or reasonably should have been made aware, of the Defect.

107. Numerous customer complaints demonstrate that BMW knew, or reasonably should have known, of the problems concerning the

**Defect, the costs associated with the necessary repairs, and how the defective condition affects its consumers.**

1. Reply With Quote
2. 02-02-2017, 11:27 AM#10

## biketroy

o Member

2013 X3

I have a 2013 X3 31000 miles, very concerned about the timing chain issue. So I called my local dealership and talked to a 12 yr service tech, I'm in SC where (I think) my X3 was made. The tech said he had never heard of any issues with this problem. Could this be true? Has BMW referenced this in a bulletin? Or some other internal or external acknowledgement? Obviously BMW knows of the problem. No problems or noises from the vehicle yet but I'm trying to be proactive. Thanks for the groups input!

Reply With Quote

3. 06-16-2017, 08:42 PM#11

## mlciac

o Member

2013 BMW X3

I would be concerned about buying a 2013-2014 car with this engine. Here is why:

Last week the timing chain broke on my 2013 X3, which has the N20 engine. It had about 52,000 miles on it, and it's about a year out of warranty. We bought ours in April 2012, one of the first 2013 X3s that were manufactured. The drivetrain error was accompanied by an engine oil pressure error, both of which came on as I was turning into my garage. No other warning. I didn't drive the car after that--it was towed from my house to my mechanic.

My independent mechanic told me the timing chain was broken, and also told me the N20 engine has had problems, that I should research this issue further. That's when I first read a long thread on Bimmerfest about this problem ( http://www.bimmerfest.com/forums/forumdisplay.php?f=158 ), and I also found that there's a Facebook community devoted to this problem ( https://www.facebook.com/BMW-Problem...3617047394760/ ). The timing chain problem seems to be better known in Europe.

I had the car towed to a dealer; they were surprised, and I do believe them when they say they haven't seen a lot of broken timing chains. That said, they confirmed the timing chain had broken, and have not yet been able to explain why. Did the plastic chain guide break? I would love to know why the chain broken on a car with low miles that was well-maintained.

I've been waiting to hear what BMW will do to make this right. So far they have offered a Trade Assist of $2000, which just made me angry. I have not

yet heard what they would be willing to offer as a goodwill repair, but the trade assist offer has us considering hiring an attorney.
*Last edited by mlciac; 06-16-2017 at 08:43 PM.*
**Reply With Quote**

4.  06-23-2017, 11:38 PM#12

88M3 99M3 04M3 ITBx16

Moved from General BMW sub-forum.
Project | 88M3 AW 43k miles OEM Shift Knob
Auto-X | 99M3 Cosmos 60k S50B32 284° euro 6Spd 3.91
Grocery| 04M3 TiAg 62k non-sunroof 3 pedal

Forum Rules
New Member Info
**Reply With Quote**

5.  06-24-2017, 07:25 PM#13

01e39 540/6,525, '11F25

First I can understand your frustration, but by all means be polite, if you've already spoken to the Service manager and the General manager ask for the phone number of the area service rep. I'm sure you can come up with this number from a web search, but this indicates you are not going to take no for an answer. The oil chain module (yes, it comes in a module) and the guide failure is also a known issue. The dealer says he hasn't seen a lot of broken chains, but guide failure is very common, so he must've at least seen that. I no longer work as a dealer tech, but the dealer I worked at was relatively small and we saw a couple of these a week. BMW should help you out as I suspect that if there is a class action suit, there will be a settlement and extended coverage. You really shouldn't have to hire an attorney. The only caveat is if the vehicle has been maintained by the book. There is no way a vehicle with 52K on the odo should suffer this catastrophic failure and they should "Goodwill" the repair.

P.S. I don't believe the dealer, he smells a several thousand dollar cash repair.
*Last edited by ptarditi; 06-24-2017 at 07:30 PM.*

---

5-14-2016, 12:43 PM

**magas** 🔵
Registered User
Location: FL

Join Date: Mar 2004
Posts: 61
Mein Auto: 2013 X3
View My Garage

**N20 Timing Chain failure Drivetrain malfunction. BMW F25 X3 2013 53,000 miles**

My wife's 2013 X3 just stopped and gave a drivetrain malfunction error in the middle of the road while she was driving.

I was unable to move it and could not push it.

I tried the emergency electronic release but after 20 minutes realized no matter what I did it would not work.

Then I remembered the manual release screw under the car!

This video helped.... But I had to remove the panels underneath with a 8mm socket to gain access to the Allen wrench screw.

Let me say..... what a pain in the ass!

Finally got the car out of gear and towed home. To make matters worse warranty just expired 3 months ago, car now has 53,000. I swear BMW does this on purpose.

No I am trying to diagnose the problem..

I am hoping its something simple... I have seen where the ignition coils have failed locking out the transmission to prevent damage...

ANy help would be appreciated. I cant believe how dangerous this car is designed. I was stuck in one spot for 1 hour trying to disengage the gear lock. I hope this helps someone else. The car was unable to be moved or towed until the lock is disabled.

Anyone have any idea on what it could be?...

**\*\*\*UPDATE\*\*\***
**The timing chain and or timing chain guards failed resulting in a total loss of the engine.**

I have had many people with the BMW N20 issue email me of similar failures and am keeping a list here...
https://docs.google.com/spreadsheets...AH4/edit#gid=0

Please add your comments to this forum if you had a similar experience.
Attached Thumbnails

| 05-19-2016, 05:52 AM | |
|---|---|
| **magas** ⚫ | Join Date: Mar 2004 |
| Registered User | Posts: 61 |
| Location: FL | Mein Auto: 2013 X3 |
| | View My Garage |

Latest update....
First it was 100 dollars to diagnose the problem at the

dealership.
Then they needed to do an "deep" inspection. Another 790 dollars.

I was told they have found metal shavings in the oil filter and still don't know what the problem is.

I think the gear of the timing chain failed, but I hope I'm wrong.

Lets see what Bmw does.

I can say I am very disappointed so far and hope bmw extends the warranty.  for the 3k miles is over.
If not this is the last time I make the mistake of buying and not leasing. Also it will be the last BMW I drive.



---

**#12**
05-20-2016, 10:34 PM

**Zerofoxm** ◯
Registered User
Location: Ðîññèÿ

Join Date: May 2016
Posts: 1

Mein Auto: Âàëåðèé
View My Garage

**Must Read Stuck Car Drivetrain malfunction and how to disabl**

Just out of interest, would you have linked to the same sort of story if it had been a UK policewoman who been killed on her first day on the job ?



---

**#13**
05-24-2016, 07:33 PM

**magas** ◯
Registered User
Location: FL

Join Date: Mar 2004
Posts: 61
Mein Auto: 2013 X3
View My Garage

So they took the care apart and found the plastic timing chain alignment guard was shattered. They are charging 6k for the repair or 17k if they need to replace the Motor.
The said I can try to contact Bmw America if they will help.
And maybe give a 10% discount.
Bad news.



05-26-2016, 10:47 AM

**namelessman**
Officially Welcomed to the 'Fest
Location: northern california

Join Date: Dec 2004
Posts: 7,274
Mein Auto: bimmer
View My Garage

To OP, is there any mod to the car? If not this seems to be an engine design issue. The plastic chain guide does look flimsy in the N20 engine build video, BMWAG should really step up and get this right, preferably with a recall.

At 1:05:

*Last edited by namelessman; 05-26-2016 at 12:30 PM.*



#**21**
05-26-2016, 02:47 PM

**magas**
Registered User
Location: FL

Join Date: Mar 2004
Posts: 61
Mein Auto: 2013 X3
View My Garage

No mods in my car.. All service done on time and at BMW.

Writing a letter to BMW NA. I hope that this helps someone else. If anything you need to extended warranty, big mistake by me to not get it.

10-03-2016, 07:40 PM

**gresh**
Registered User
Location: VA, USA

Join Date: Aug 2016
Posts: 88
Mein Auto: 2011 X6 3.5i; 2013 X3 2.8
View My Garage

Quote:

Originally Posted by **dukedkt442** 
*Fortunately, the chances of the N20 going to 73k unaided are slim.*

Mine made it to 83k before it died. I put a used engine in it.

#**78**
10-09-2016, 09:28 PM

**dukedkt442**

Join Date: Feb 2013

Officially Welcomed to the 'Fest
Location: Upstate, NY

Posts: 1,479
Mein Auto: 08 E83; '86 442; 84 GMC
<u>View My Garage</u>

---

#**79**
11-02-2016, 06:49 PM

**<u>Nabs</u>** ⚪
Registered User
Location: Maryland

Join Date: Nov 2016
Posts: 7
Mein Auto: X3
View My Garage

**Timing chain in N20 engine on x3 2013**

My x3 has about 54000 on it. I feel sick to my stomach because BMW told me it was going to cost 23k to replace the engine . My car stopped in the middle of the road. The tech found the timing chain module broken and metal in throughout the valve train. The vehicle jumped timing and there is excessive wear present in the valve train.

They are calling BMW tomorrow to see if they are going to help. Let's hope they do the right thing. Please any documentation any has on this please send my way: God Bless!!

[Quote]

---

#**80**
11-07-2016, 01:02 PM

**<u>ryanleeus</u>** ⚪
Registered User '16
Location: Northern California

Join Date: Oct 2016
Posts: 8
Mein Auto: '14 X3 xDrive28i
View My Garage

Quote:

Originally Posted by **Nabs** ➡
*My x3 has about 54000 on it. I feel sick to my stomach because BMW told me it was going to cost 23k to replace the engine . My car stopped in the middle of the road. The tech found the timing chain module broken and metal in throughout the valve train. The vehicle jumped timing and there is excessive wear present in the valve train.*

*They are calling BMW tomorrow to see if they are going to help. Let's hope they do the right thing. Please any documentation any has on this please send my way: God Bless!!*

Nabs,

I saw your post in another thread and am glad your X3 was taken care of by the BMW dealer. Can you elaborate on what happened when your car "stopped in the middle of the road"? Was it a sudden jerk to a stop from like 40mph to 0mph?

Crossing my fingers here for my X3 2.8i...



---

#81
11-07-2016, 01:56 PM

**Nabs** ○
Registered User
Location: Maryland

Join Date: Nov 2016
Posts: 7
Mein Auto: X3
View My Garage

Hi Ryan,

Yes, I was driving at about 35- 40 miles per hour. Engine made a horrible sound and the car completely died, just stopped abruptly. Thank goodness I didn't have anyone beyond me. It wouldn't go into Neutral. It wouldn't start, couldn't do much except for calling a tow truck. A



---

#82
11-07-2016, 01:58 PM

**ryanleeus** ○
Registered User '16
Location: Northern California

Join Date: Oct 2016
Posts: 8
Mein Auto: '14 X3 xDrive28i
View My Garage

Nabs,

Wow.. that's terrible. I drive more on freeways than local roads myself, and I have a 528i that I had to tow without being able to get the car into Neutral either.

BMW needs to issue a recall for this ASAP, but I doubt BMW North America will want to spend that much money replacing engines pre-emptively. Good to know you were safe and that no one was immediately ahead of you.



108. Additionally, predecessor models which used the identical chain assembly components had been failing prior to their expected life, so that Defendant should have known that the same Defect existed prior to the sale of certain model year Class Vehicles.

109. BMW was aware of the Defect when it began warranting, advertising, promoting, marketing, distributing, selling and leasing the Class Vehicles, yet failed to take any remedial action. Rather, BMW actively and intentionally concealed and failed to disclose the Defect from Plaintiffs and the other members of the Class at the time of purchase or lease, and thereafter.

110. BMW had exclusive knowledge of and/or concealed material information about the Defects and failed to disclose the Defects to Plaintiffs and other class members in any pre-sale materials and during any service visits—the time at which Plaintiffs and other class members could have acted. BMW had exclusive knowledge of and/or actively concealed the truth about the existence and nature of the Defect from Plaintiffs and other class members at all times, even though BMW knew about the Defect and knew that information about the Defect would be important to a reasonable consumer.

111. BMW has still failed to disclose the truth about the Defect to consumers and the general public. Thus, BMW has never

taken any action to inform consumers about the true nature of the Defect in the Class Vehicles despite the fact that BMW has (and had) exclusive knowledge of and/or actively concealed the truth about the existence and nature of the Defect.

112. Instead, BMW stealthily issued one internal Technical Service Bulletin, admitting that one fix for the Defect.

113. The Defendant deliberately ignored the primary and secondary chain assembly defects for years to avoid the costs associated with remedying these defects while the Class Vehicles were still under warranty. Now Defendant is attempting to conceal the primary chain defects by changing the primary chain assembly components for the purported purpose of remedying the secondary chain assembly noise.

114. Although the Defendant knew by late 2012 or early 2013 that the engines were experiencing premature chain assembly failure, Defendant continued to sell Class Vehicles with defective chain assemblies. This knowledge by BMW-NA is imputable to BMW-AG because the former was monitoring warranty claims and Class Vehicle performance in the United States and reporting back to the parent company in Munich.

115. BMW concealed and/or had exclusive knowledge of material information about the Defect, yet failed to disclose the Defect in order to induce Plaintiffs and other class members to purchase or lease its vehicles rather than competitors' vehicles and to

continue to service their vehicles. Had BMW disclosed the truth, Plaintiffs (and reasonable consumers) 1) would have paid less for the Class Vehicles, 2) would not have purchased or leased the Class Vehicles at all, or 3) would have brought their Class Vehicles in for service during the warranty period or at least prior to catastrophic engine failure.

116. BMW, like all automakers, is under a duty to disclose a known defect in a vehicle when there are safety concerns associated with the vehicle's use — *i.e.*, where the failure to disclose implicates a safety issue. Manufacturers may be held liable for their failure to disclose a defect when such an omission pertains to a safety issue. In this case, as stated above, BMW knew about the Defect, and the Defect poses a physical threat to Plaintiffs' own safety or the safety of others. Nevertheless, BMW failed to disclose the Defect to all owners of the Class Vehicles.

117. Based on the above, BMW knew of the Defect at the time it sold or leased the Class Vehicles, and the potential danger it posed to consumers.

118. Based upon all the foregoing, BMW was aware of the Defect when it began warranting, advertising, promoting, marketing, distributing, selling and leasing the Class Vehicles, and repairing the Class Vehicles, yet failed to take any remedial action.

119. Despite all of the foregoing, BMW has refused to address and rectify the Defect, and has failed and refused to reimburse its customers for the monies they were forced to expend, and are continually forced to expend, as a direct and proximate result of the Defect.  BMW has failed to implement a plan to address the Defect, and has instead manufactured, warranted, advertised, promoted, marketed, distributed, sold and leased subsequent models that contain the same or substantially similar Defect, which they actively and intentionally concealed.

120. Buyers, lessees and other owners of the Class Vehicles were without access to the information concealed by BMW as described herein, and therefore reasonably relied on BMW's representations and warranties regarding the quality, durability, and other material characteristics of the Class Vehicles. Had these buyers and lessees not been purposely deceived by BMW regarding their vehicles and the known defects within them, Plaintiffs and the other members of the Class would have paid less for their vehicles than the amounts they actually paid, or would not have purchased the vehicles at all.

D. **BMW's Warranty**

121. BMW issued warranties to each owner or lessee of the Vehicles.

122. Under these warranties, BMW agreed to repair defects reported within four years or 50,000 miles.

123. BMW instructs owners and lessees to bring their vehicles to a BMW dealership for warranty repairs.

124. Many owners and lessees have presented the Class Vehicles to BMW dealerships with complaints related to the Defect. BMW has evaded its warranty obligations by failing to inform owners and lessees of the Class Vehicles of the existence of the Defect.

125. In many if not most instances the Defect does not manifest until after the expiration of the warranty and BWM is well aware of this fact.

126. Owners and lessees of the Class Vehicles have incurred, and will continue to incur, expenses for the diagnosis and repair of the Defect, and in some instances the expense of total replacement of the engine for their Class Vehicles with catastrophic engine failure, despite such Defect having been contained in the Vehicles when manufactured, distributed, advertised, marketed, and warranted by BMW.

## VII. CLASS ACTION ALLEGATIONS

127. Plaintiffs bring this action on behalf of themselves and all other persons similarly situated, pursuant to Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the following class and subclass (collectively, the "Classes"):

### The Nationwide Class

All persons or entities in the United States who own, lease, or have owned or have leased, a BMW with an N20/N26 engine in any BMW model containing the Defect.

### The New Jersey Subclass

All persons or entities in New Jersey who own, lease, or have owned or have leased, a BMW with an N20/N26 engine in any BMW model containing the Defect.

### The Massachusetts Subclass

All persons or entities in Massachusetts who own, lease, or have owned or have leased, a BMW with an N20/N26 engine in any BMW model containing the Defect.

### The Texas Subclass

All persons or entities in Texas who own, lease, or have owned or have leased, a BMW with an N20/N26 engine in any BMW model containing the Defect.

### The California Subclass

All persons or entities in California who own, lease, or have owned or have leased, a BMW with an N20/N26 engine in any BMW model containing the Defect.

### The Wisconsin Subclass

All persons or entities in Wisconsin who own, lease, or have owned or have leased, a BMW with an N20/N26 engine in any BMW model containing the Defect.

### The Oregon Subclass

All persons or entities in Oregon who own, lease, or have owned or have leased, a BMW with an N20/N26 engine in any BMW model containing the Defect.

### The New York Subclass

All persons or entities in New York who own, lease, or have owned or have leased, a BMW with an N20/N26 engine in any BMW model containing the Defect.

### Excluded from all Classes

Excluded from the Classes are: (a) Defendant, any entity in which Defendant has a controlling interest, and its legal representatives, officers, directors, employees, assigns, and successors that purchased the Vehicles; (b) the judge to whom this case is assigned and any member of the judge's immediate family; and (c) individuals with claims for personal injury, wrongful death and/or emotional distress.

128. __Numerosity/Impracticability of Joinder__: The members of the Class are so numerous that joinder of all members would be impracticable. The Class is believed to include tens of thousands of members. The Class is composed of an easily ascertainable, self-identifying set of individuals and entities that own, lease or owned and leased the Vehicles. The precise number of Class members can be ascertained by reviewing documents in Defendant's possession, custody, and control.

<u>129. Commonality and Predominance</u>: There are common questions of law and fact that predominate over any questions affecting only individual members of the Class. These common legal and factual questions, include, but are not limited to, the following:

a. Whether the Class Vehicles suffer from the Defect;

b. Whether the defective nature of the primary and secondary chain assemblies constitutes a material fact;

c. Whether BMW knew, or reasonably should have known, that the Vehicles were defectively designed, manufactured, marketed, distributed, advertised, warranted, sold, leased, and serviced;

d. Whether BMW knew or reasonably should have known of the Defect to the primary and secondary chain assemblies before it sold and leased the Class Vehicles to Plaintiffs and the other members of the Class;

e. Whether BMW had a duty to disclose the Defect to Plaintiffs and the other members of the Class;

f. Whether BMW actively and intentionally concealed, failed to disclose and/or omitted material information in its marketing, advertising, sale and lease of the Class Vehicles concerning the existence of the Defects;

g. Whether BMW actively and intentionally concealed, failed to disclose and/or omitted material information when repairing the Class Vehicles concerning the existence of the Defect;

h. Whether Plaintiffs and the other members of the Class are entitled to equitable relief, including but not limited to a preliminary and/or permanent injunction;

i. Whether BMW should be declared financially responsible for notifying all members of the Class of the Defect in the Class Vehicles, and for the costs and expenses of repairing the Defect or replacing the engines in Class Vehicles where the engine has failed as a result of the Defect;

j. **Whether BMW is obligated to inform members of the Class of their right to seek reimbursement for having paid for repairs or engine replacement due to the Defect;**

k. **Whether BMW violated the consumer protection laws in the New Jersey Consumer Fraud Act (hereinafter, the "CFA"), N.J.S.A. 56:8-1, et seq., and/or the consumer protection laws of the states involving sub-class members.**

l. **Whether BMW's conduct violates warranty laws, and other laws as asserted herein;**

m. **Whether, as a result of BMW's omissions and concealments of material facts related to the Defect, Plaintiffs and the other members of the Class have suffered ascertainable losses, and whether Plaintiffs and the other members of the Class are entitled to monetary damages and/or other remedies, and if so the nature of any such relief;**

n. **Whether BMW's acts and/or omissions entitle Plaintiffs and the other members of the Class to treble damages, attorneys' fees, prejudgment interest and cost of suit.**

130. <u>Typicality</u>: **Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and the other members of the Class have suffered similar injury by the same wrongful practices by BMW. The claims of Plaintiffs and the other members of the Class all arise from the same wrongful practices and course of conduct, and are based on the same legal and remedial theories.**

131. <u>Adequacy Of Representation</u>: **Plaintiffs will fully and adequately assert and protect the interests of the members of the Class, and have retained class counsel who are experienced and qualified in prosecuting class actions. Neither Plaintiffs nor**

their attorneys have any interests that are contrary to or conflicting with the members of the Class.

132. Superiority Of Class Action And Impracticability Of Individual Actions: A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit, because individual litigation of the claims of all members of the Class is not economically feasible and is procedurally impracticable. While the aggregate damages sustained by the members of the Class are in the millions of dollars, and are no less than five million dollars, upon information and belief, the individual damages incurred by each member of the Class resulting from BMW's wrongful course of conduct are too small to warrant the expense of individual suits. The likelihood of individual members of the Class prosecuting their own separate claims is remote, and, even if every Class member could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases. Individual members of the Class do not have a significant interest in individually controlling the prosecution of separate actions, and individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all of the parties and to the court system because of multiple trials of the same factual and legal issues. Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude

45

its maintenance as a class action. In addition, BMW has acted or refused to act on grounds generally applicable to the members of the Class and, as such, final injunctive relief or corresponding declaratory relief with regard to the members of the Class as a whole is appropriate.

## VIII. <u>CLAIMS FOR RELIEF</u>

A. Claims Brought on Behalf of the Nationwide Class, or Alternatively, By Plaintiffs Williams and Patel on behalf of <u>the New Jersey Class</u>

### <u>FIRST COUNT -- OMISSION</u>

#### <u>(Violations of New Jersey's Consumer Fraud Act,</u>
#### <u>N.J.S.A. § 56:8-2, et seq.)</u>

133. Plaintiffs on behalf of themselves and all others similarly situated, incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

134. This claim is brought on behalf of the Nationwide Class or alternatively on behalf of Williams and Patel on behalf of the New Jersey Class.

135. BMW has engaged in deceptive, unconscionable, unfair, fraudulent and/or misleading commercial practices in the advertising, promoting, marketing, distributing, selling and leasing of the Class Vehicles it knew to be defective.

136. BMW intentionally omitted the fact that its goods, merchandise and/or services did not have characteristics, uses, benefits, or quantities that were advertised and promoted, and

failed to disclose that its goods, merchandise and/or services were not of a particular standard, quality or grade.

137. BMW had a duty to Plaintiffs and the Nationwide Class to disclose the defective nature of the Class Vehicles and the Defect because:

    a. BMW was in a superior position to know the true state of facts about the Defect and repair costs in the Class Vehicles;

    b. Plaintiffs and the Nationwide Class could not reasonably have been expected to learn or discover that the Class Vehicles and primary and secondary time chain assemblies had dangerous safety defects until after manifestation of the Defect;

    c. BMW knew that Plaintiffs and the Nationwide Class could not reasonably have been expected to learn or discover the Defect and the associated repair costs until the manifestation of the Defect.

138. In failing to disclose the Defects and the associated risks and repair costs, BMW undertook active and ongoing steps to intentionally conceal the Defects, and has concealed, failed to disclose and/or omitted material facts from Plaintiffs and other members of the Nationwide Class with respect to the Defect in the Class Vehicles.

139. BMW intended that Plaintiffs and the other members of the Nationwide Class would rely upon its acts of concealment and/or omission by purchasing or leasing the Vehicles at full price rather

than paying less to purchase or lease the Class Vehicles, or purchasing or leasing other vehicles.

140. BMW intended that Plaintiffs and the other members of the Nationwide Class would rely upon its acts of concealment and/or omission to avoid replacing the defective parts during the warranty period.

141. BMW's omissions were objectively deceptive, and had the capacity to deceive reasonable consumers under the circumstances. The fact that BMW knew about and failed to disclose that the Defect in the Class Vehicles was a material fact that a reasonable and/or unsophisticated consumer would attach importance to at the time of purchase or lease. This fact would influence a reasonable consumer's choice of action during the purchase or lease of a vehicle.

142. Such practices contravene the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, et seq.

143. As a direct and proximate result of BMW's violations of the NJCFA, Plaintiffs and the other members of the Nationwide Class have suffered ascertainable losses, which include but are not limited to, the monies they were forced to expend — and will have to expend in the future — to repair and/or replace their vehicles' timing chains or the entire engine in instances of catastrophic engine failure, the diminished value of their vehicles, and the failure to receive the benefit of their purchases or leases, and

48

accordingly were harmed by Defendants' actions in violation of the NJCFA.

<u>SECOND COUNT – OVER CHARGING</u>

<u>(Violations of New Jersey's Consumer Fraud Act,
N.J.S.A. § 56:8-2, et seq.)</u>

144. Plaintiffs, on behalf of themselves and all others similarly situated, incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

145. This claim is brought on behalf of the Nationwide Class or alternatively on behalf of Williams and Patel on behalf of the New Jersey Class.

146. BMW has engaged in deceptive, unconscionable, unfair, fraudulent and/or misleading commercial practices in the advertising, promoting, marketing, distributing, selling and leasing of the Class Vehicles at a premium price despite knowing that they were defective.

147. BMW charged a premium for its N20/N20 engine Vehicles, despite knowing that its goods, merchandise and/or services had characteristics, uses, benefits, or quantities that they did not have, and that its goods, merchandise and/or services were of a particular standard, quality or grade that they were not.

148. BMW sets the pricing for the Class Vehicles at its headquarters in New Jersey.

149. In its advertising, promoting, marketing, distributing, selling and leasing of the Class Vehicles, BMW undertook active and ongoing steps to charge a premium price for the Class Vehicles while intentionally concealing the Defect, and has consciously concealed, failed to disclose and/or omitted material facts from Plaintiffs and other members of the Nationwide Class with respect to the Defect.

150. BMW intended that Plaintiffs and the other members of the Nationwide Class would rely upon its acts of concealment and/or omission by purchasing or leasing the Class Vehicles at premium price rather than paying less to purchase or lease the Class Vehicles, or purchasing or leasing other vehicles.

151. BMW's conduct was objectively deceptive, and had the capacity to deceive and defraud reasonable consumers under the circumstances. The fact that BMW knew about and failed to disclose the Defect was a material fact that a reasonable and/or unsophisticated consumer would attach importance to at the time of purchase or lease. This fact would influence a reasonable consumer's choice of action during the purchase or lease of a vehicle.

152. Such practices contravene the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, et seq.

153. As a direct and proximate result of BMW's violations of the NJCFA, Plaintiffs and the other members of the Nationwide Class

have suffered ascertainable losses, which include but are not limited to, the premium price the Nationwide Class paid for the Class Vehicles, the monies they were forced to expend — and will have to expend in the future — to repair and/or replace timing chains and/or engines, the diminished value of their vehicles, and the failure to receive the benefit of their purchases or leases, and accordingly were harmed by Defendants' actions in violation of the NJCFA.

## THIRD COUNT

### (Common Law Fraud)

154. Plaintiffs, on behalf of themselves and all others similarly situated, incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

155. This claim is brought on behalf of the Nationwide Class.

156. BMW consciously and intentionally concealed, failed to disclose and/or omitted a material presently existing or past fact. For example, BMW did not fully and truthfully disclose to their customers the presence of the Defect. As a result, Plaintiffs and the other members of the Nationwide Class were fraudulently induced to purchase or lease Class Vehicles containing the Defect and to pay for numerous repairs to Class Vehicles containing the Defect.

157. These concealments and/or omissions were intentionally made by BMW with knowledge of their falsity, and with the intent

that Plaintiffs and the other members of the Nationwide Class would rely upon them.

158. Plaintiffs and the other members of the Nationwide Class reasonably relied on BMW's concealments and/or omissions, and suffered damages as a result.

### FOURTH COUNT

### (Breach of Express Warranty)

159. Plaintiffs, on behalf of themselves and all others similarly situated, incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

160. This claim is brought on behalf of the Nationwide Class of alternatively on behalf of the State Subclasses.

161. BMW provided all purchasers and lessees of the Class Vehicles with the express warranties described herein, which became part of the basis of the bargain.

162. Accordingly, BMW warranties are express under state law.

163. The components that must be repaired and/or replaced as a result of the Defect, as well as the other damages caused as a result of the Defect, as described herein, are covered by the express warranties BMW provided all purchasers and lessors of the Class Vehicles.

164. Plaintiffs and the other members of the Nationwide Class have complied with all obligations and requirements under the Class

Vehicles' express warranties, or are otherwise excused from performance of said obligations and requirements.

165. BMW breached these warranties by selling and leasing Class Vehicles which they knew, or reasonably should have known, contained the Defect and required repair or replacement within and outside the applicable warranty periods, and/or refused to honor the warranties by providing free repairs and/or replacements during the applicable warranty period or periods or after the warranty expired, which is when the Defect typically manifested.

166. Plaintiffs notified BMW of the breach within a reasonable time, and/or was not required to do so because affording BMW a reasonable opportunity to cure its breach of written warranty would have been futile. BMW also knew of the Defect and yet chose to conceal it and to not comply with their warranty obligations.

167. As a direct and proximate result of BMW's breach of the Class Vehicles' express warranties, Plaintiffs and the other members of the Nationwide Class were damaged by, among other things, being forced to expend monies – and will continue to be forced to expend monies – to repair and/or replace their vehicles' components, and diminution in value of their vehicles.

168. BMW's attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, BMW's warranty limitation is unenforceable because they knowingly sold a

defective product without informing consumers about the Defect and in most instances the Defect does not manifest itself until after the express warranty expires. The timing chain assemblies are expected to last for the life of the vehicle which is at least 150,000 miles according to BMW's own service booklet.

169. The time limits contained in BMW's warranty period were also unconscionable and inadequate to protect Plaintiffs and members of the Nationwide Class. Among other things, Plaintiffs and the other members of the Nationwide Class had no meaningful choice in determining these time limitations the terms of which unreasonably favored BMW. A gross disparity in bargaining power existed between BMW and Plaintiffs and the Nationwide Class, and BMW knew or should have known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives.

170. Plaintiffs and members of the Nationwide Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of BMW's conduct described herein.

<u>FIFTH COUNT</u>

(Breach of Implied Warranty)

171. Plaintiffs, on behalf of themselves and all others similarly situated, incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

172. This claim is brought on behalf of the Nationwide Class or alternatively on behalf of the State Subclasses.

173. BMW was at all relevant times the manufacturer, distributor, warrantor, and/or seller of the Vehicles. BMW knew, or reasonably should have known, of the specific use for which the Class Vehicles were purchased or leased.

174. BMW provided Plaintiffs and the other members of the Nationwide Class with an implied warranty of merchantability that the Class Vehicles, and any components thereof, are merchantable and fit for the ordinary purposes for which they were sold or leased.

175. BMW impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty of merchantability included, among other things: (1) a warranty that the Class Vehicles, and the engines required for operation were manufactured, supplied, distributed, sold and/or leased by BMW were safe and reliable for providing transportation, and would not experience loss of power, the ability to steer or total engine failure while driving; and (ii) a warranty that theClass Vehicles would be fit for their intended use while the vehicles were being operated.

176. Contrary to the applicable implied warranties of merchantability, the Class Vehicles were not fit for their ordinary and intended purpose of providing Plaintiffs and the other members

of the Nationwide Class with reliable, durable, and safe transportation.

177. Defendant breached the Class Vehicles' implied warranty of merchantability by selling or leasing Plaintiffs and the other members of the Nationwide Class vehicles, and/or components thereof, that are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, *inter alia*, the Class Vehicles suffered from the Defect at the time of sale or lease rendering the Class Vehicles unfit for their particular purpose of providing safe and reliable transportation.

<u>SIXTH COUNT</u>

(Breach of Written Warranty Under the
Magnuson-Moss Warranty Act, 15 U.S.C. § 230 *et seq*.)

178. Plaintiffs, on behalf of themselves and all others similarly situated, incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

179. This claim is brought on behalf of the Nationwide Class.

180. Plaintiffs and other members of the Nationwide Class are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

181. BMW is a "supplier[]" and "warrantor[]" within the meaning of 15 U.S.C. §§ 2301(4)-(5).

182. The Vehicles are "consumer products" within the meaning of 15 U.S.C. § 2301(1).

183. BMW's express warranty is a "written warranty" within the meaning of 15 U.S.C. § 2301(6).

184. BMW breached the express warranty by selling and leasing vehicles which they knew, or reasonably should have known, contained the Defect and required repair or replacement within the applicable warranty periods, and/or refused to honor the warranties by providing free repairs and/or replacements during the applicable warranty period or periods.

185. BMW's breach of the express warranty deprived the Plaintiffs and the other members of the Nationwide Class of the benefits of their bargains.

186. The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum or value of $25. In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

187. BMW has been afforded a reasonable opportunity to cure its breach of written warranty, including when Plaintiffs and other members of the Nationwide Class brought their Class Vehicles in for diagnoses and repair of the Defect.

188. As a direct and proximate result of BMW's breach of written warranty, Plaintiffs and other members of the Nationwide Class sustained damages and other losses in an amount to be determined at trial. BMW's conduct damaged Plaintiffs and other

members of the Nationwide Class who are entitled to recover damages, consequential damages, specific performance, diminution in value, costs, attorneys' fees, rescission, and/or other relief as appropriate.

B. <u>Claims Brought on Behalf of the Massachusetts's Subclass</u>

<u>SEVENTH COUNT</u>

<u>(Violations of Massachusetts's Consumer Protection Law, Mass. Gen. L. Chapter 93.)</u>

189. Gagnon, on behalf of himself and all others similarly situated, incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

190. This Claim is brought on behalf of the Massachusetts Subclass.

191. Gagnon sent BMW a notice of violation of the Massachusetts Consumer Protection Act. The notice stated that BMW had 30 days to cure the violation under Mass. Gen. L. 93A.

192. The notice further stated:

> BMW's conduct constitutes unfair business practices by making representations that: (i) the Vehicles have characteristics, uses, and benefits which they do not have; (ii) the Vehicles are of a particular standard, quality, or grade, when they are of another; and (iii) the Vehicles have been supplied in accordance with a previous representation when they have not.

> Under the MA CPL, BMW was obligated to disclose its knowledge of the Defect because (i) BMW had exclusive superior knowledge of the material facts not known to Gagnon and the

58

public, since only BMW had access to the data from its manufacturers, its own research and tests, and other information it obtained and or recorded; (ii) BMW actively concealed and suppressed the material facts from Gagnon and public by not revealing the Defect when it knew would not cure the malfunctioning Vehicles, while representing to consumers either expressly or impliedly that there were no reliability or safety problems with the Vehicles' timing chain assemblies; and (iii) BMW made representations about the Vehicle's "safe," "reliable," and "durable" performance while withholding the material fact that the Vehicles contained the Defect.

193.  The notice also stated:

FAILURE TO TAKE THE ABOVE ACTION WITHIN 30 DAYS OF RECEIPT OF THIS NOTICE SHALL RESULT IN OUR OFFICE MAINTAINING ITS CLAIMS AGAINST BMW UNDER THE MA CPL ON BEHALF OF ALL OTHERS SIMILARLY SITUATED seeking (i) all recoverable compensatory and other damages sustained by purchasers and/or owners of the Vehicles; (ii) restitution and disgorgement of all amounts obtained by BMW as a result of its misconduct, together with interest thereon, from the date of payment, to the victims of such violations; (iii) actual, treble, and/or statutory damages for injuries suffered by all similarly situated individuals in the maximum amount permitted by applicable law; (iv) injunctive relief; (v) statutory pre-judgment and post-judgment interest; (vi) payment of reasonable attorneys' fees and costs as may be allowable under applicable law; and (vii) such other relief as a court of competent jurisdiction may deem just and proper. (emphasis in original).

194.  BMW has not respond to Gagnon's letter putting them on notice of BMW's violation of the Massachusetts Consumer Protection Law.

195. Gagnon has thus complied with the pre-suit demand requirement of the Massachusetts Consumer Protection Law.

196. BMW has engaged in deceptive, unconscionable, unfair, fraudulent and/or misleading commercial practices in the advertising, promoting, marketing, distributing, selling and leasing of the Class Vehicles it knew to be defective.

197. BMW represented that its goods, merchandise and/or services had characteristics, uses, benefits, or quantities that they did not have, and that its goods, merchandise and/or services were of a particular standard, quality or grade that they were not.

198. In its advertising, promoting, marketing, distributing, selling and leasing of the Class Vehicles, BMW undertook active and ongoing steps to intentionally conceal the Defect, and has concealed, failed to disclose and/or omitted material facts from Gagnon and the other members of the Massachusetts Subclass with respect to the Defect in the Class Vehicles.

199. BMW intended that Gagnon and the other members of the Massachusetts Subclass would rely upon its concealment and/or omission by purchasing or leasing the Class Vehicles at full price rather than paying less to purchase or lease the Class Vehicles, or purchasing or leasing other vehicles.

200. BMW intended that Gagnon and the other members of the Massachusetts Subclass would rely upon its concealment and/or

omission by continuing to repair the Class Vehicles and to continue paying for repairs to the Class Vehicles or facing catastrophic engine failure.

201. BMW's conduct was objectively deceptive, and had the capacity to deceive reasonable consumers under the circumstances. The existence of the Defect was a material fact that a reasonable and/or unsophisticated consumer would attach importance to at the time of purchase or lease. This fact would influence a reasonable consumer's choice of action during the purchase or lease of a vehicle.

202. Such practices contravene the MA CPL.

203. As a direct and proximate result of BMW's violations of the Massachusetts Consumer Protection Law, Gagnon and the other members of the Massachusetts Subclass have suffered ascertainable losses, which include but are not limited to, the monies they were forced to expend – and will have to expend in the future – to repair and/or replace their vehicles' timing chain assemblies or the entire engines, the diminished value of their vehicles, and the failure to receive the benefit of their purchases or leases, and accordingly were harmed by Defendants' actions in violation of the MA CPL.

C. Claims Brought on Behalf of the Texas Subclass

### EIGHTH COUNT

### Violation of the Texas Deceptive Trade Practices Action

204. Plaintiff, Cerny on behalf of himself and all others similarly situated, incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

205. Plaintiff Cerny asserts this claim individually and on behalf of the Texas sub-class.

206. Plaintiff Cerny is a consumer as defined in the Texas Deceptive Trade Practices Act (DTPA), Tex. Bus. & Comm. Code § 17.41, et seq.

207. BMW can be sued under the DTPA, because the DTPA allows a plaintiff to bring a cause of action against any person who uses or employs false, misleading, or deceptive acts or practices. See Tex. Bus. & Com. Code §17.50(a)(1). Corporations are defined to be included as persons. See Tex. Bus. & Com. Code §17.45(3).BMW conducts trade and commerce in Texas.

208. The wrongful conduct of BMW, as described herein, constitutes one or more violations of the Texas DTPA, including but not limited to the following:

        a. False, misleading, unfair and/or deceptive acts or practices including, but not limited to, representing that class Vehicles equipped with its N20/N26 engines are superior quality and had characteristics and/or benefits that it did not have; representing that the Class Vehicles were of a particular standard or quality

that it was not; and/or failing to disclose known information about the Class Vehicles, including manufacturing and design defects regarding the primary and secondary timing chain assemblies, in order to induce consumers, such as Plaintiff, into a transaction that the consumers would not have entered into had the information been disclosed;

b. Breach of an express and/or implied warranty; and

c. Unconscionable acts or practices involving the design, manufacture, testing, marketing, promotion, distribution, and sale of the Class Vehicles.

209. Plaintiff Cerny and other members of the Texas sub-class relied on BMW's false, misleading and/or deceptive acts and practices to their detriment.

210. BMW acted unconscionably in failing to provide the proper course of action to remedy the defective Vehicles. See Tex. Bus. & Com. Code §17.50(a)(3).

211. Plaintiff Cerny notified BMW giving Defendant a reasonable opportunity to correct the defect. Although BMW ultimately replaced the Defective parts Cerny was charged several thousand dollars to correct the defect.

212. BMW's acts and/or omissions in violation of the Texas DTPA were a producing cause of Plaintiff Cerny's injuries, including economic damages.

213. BMW's wrongful conduct was committed knowingly and/or intentionally making BMW liable for treble damages under the Texas DTPA. Plaintiff Cerny, therefore, is entitled to and will seek threefold the economic damages sustained, plus reasonable and necessary attorneys' fees, and costs of court, in accordance with Tex. Bus. & Com. Code §17.50.

D. <u>Claims Brought on Behalf of the California Subclass</u>

### NINTH COUNT

### Violation of Cal. Bus. & Prof. Code § 17200 et seq.)

214. Plaintiff Arat on behalf of himself and all others similarly situated incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

215. Business & Professions Code §17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."

216. Defendant has engaged in unfair, unlawful, and fraudulent business acts or practices as set forth above.

217. Plaintiff brings this cause of action on behalf of himself and the California Class, pursuant to California Business and Professions Code, §17200, *et seq*.

218. Arat and the Class members are reasonable consumers who do not expect their Class Vehicles to experience the Defect, who do not expect their timing chains to fail before the end of the

expected useful life of the Class Vehicles and who do not expect their engines to fail prematurely. These are reasonable and objection consumer expectations relating to the Class Vehicles.

219. Defendant knew and has known that the Class Vehicles suffer from the Defect, were defectively designed or manufactured, would experience the Defect and were not suitable for their intended use.

220. In failing to disclose the Defect, Defendant has knowingly and intentionally concealed material facts and breached the duty not to do so.

221. Defendant was under a duty to Arat and the Class members to disclose the defective nature of the Class Vehicles because Defendant was in a superior position to know the true facts about the Defect in the Class Vehicles and Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles.

222. The facts concealed and not disclosed by Defendant to Arat and the Class members are material in that a reasonable person would have considered them to be important in deciding whether to purchase the Class Vehicles. Had Arat and the other Class members known that the Class Vehicle had the Defect, Arat and the Class Member would not have purchased the Class Vehicles.

223. Defendant continued to conceal the defective nature of the Class Vehicles even after Class Members began to report

problems. Defendant continued to cover up and conceal the true nature of the Defect, did not disclose to consumers that the Defect exists, and did not reimburse consumers for costs incurred in connection with the Defect.

224. Defendant's conduct constitutes unfair business acts and/or practices because Defendant's practices have caused and are likely to cause substantial injury to Plaintiff and Class members which injury was not reasonably avoidable by Plaintiff in light of Defendant's exclusive knowledge of the primary and secondary timing chain assembly defects, and is not outweighed by the acts' and practices' benefits, if any, to Plaintiff and Class members. Such conduct is ongoing and continues to this date.

225. The unfair or deceptive practices occurred repeatedly in Defendant's trade or business, and are capable of deceiving a substantial portion of the purchasing public.

226. The injury to consumers is substantial, particularly because the Class Vehicles are defective at the time of sale and continue to be defective after repair attempts during the warranty period.  Plaintiffs and Class members paid thousands of dollars for Class Vehicles that they would not otherwise have spent for Class Vehicles that have the Defect.  The Class Vehicles are worth substantially less than Plaintiffs and Class members paid for them given the primary and secondary timing chain assembly defects.

227. The injury to consumers is not outweighed by any countervailing benefits to consumers or competition. Any purported benefits to consumers from the design of the Vehicles are negated by the Defects and the subsequent catastrophic engine failure that occurs.

228. The injury to consumers is not an injury that consumers themselves could reasonably have avoided because consumers did not know about the primary and secondary timing chain assembly defects before they bought or leased their Class Vehicles.

229. Defendant's acts and practices of selling and leasing Class Vehicles with primary and secondary timing chain assembly defects offends an established public policy and are immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

230. It is unethical and oppressive to charge a premium price for a product that fails of its essential purpose. Further, as alleged in detail above, Defendants actually knew about the existence of the primary and secondary timing chain assembly defects, which renders Defendant's conduct particularly deceptive, immoral, unethical, oppressive and unscrupulous.

231. Defendant's conduct also offends established public policies concerning consumer protection and class action litigation. California also has established a public policy against allowing manufacturers to escape liability for placing

defective consumer products in the stream of commerce by imposing liability on them, and subjecting them to penalties, under the implied warranty of merchantability by operation of law under the Song-Beverly Act, Cal. Civ. Code § 1790 *et seq*.

232. Defendant's acts, practices and omissions threaten an incipient violation of antitrust laws and/or consumer protection statutes, or violate the policy and spirit of one of those laws because the effect of the acts and practices are comparable to or the same as a violation of the law or otherwise significantly threaten or harm competition. Defendant's acts and practices harm competition by luring consumers to buy its Class Vehicles, instead of the vehicles manufactured and sold by Defendant's competitors. The free market requires the free flow of information to run effectively. Defendant's failure to disclose the material fact that the primary and secondary timing chain assembly are defective and cause engine failure, impedes the free market.

233. Furthermore, BMW wrongfully gained money by making the sale or lease of Class Vehicles to Californians, such as Arat, which wrongful gain should be restored to Californians that purchased or leased Defendant's Class Vehicles.

234. Defendant's acts and practices are unlawful because they violate the Song-Beverly Act, Civil Code §§ 1790 *et seq*., the Consumer Legal Remedies Act, Civil Code 1750 *et seq*., Bus. & Prof.

Code § 17500, the California Commercial Code, and the Magnuson-Moss Warranty Act ("MMWA").

      i.   Defendant violates Cal. Bus. & Prof. Code § 17500 as alleged throughout this Complaint and incorporated hereto by reference.

     ii.   Defendant violates the CLRA, Cal. Civ. §§ 1750 *et seq.*, as alleged throughout this Complaint and incorporated by reference hereto.

    iii.   Defendant violates Cal. Civ. Code §§ 1790 *et seq.*, the California Commercial Code, and the MMWA as alleged throughout this Complaint, and incorporated hereto by reference.

235. Defendant's acts and practices are fraudulent in that they have deceived and/or are "likely to deceive" Plaintiff and members of the consuming public. Defendant sold or leased Plaintiff and Class members Class Vehicles with primary and secondary timing chain assembly defects that have rendered the Vehicles unsafe and unusable for the purposes for which they were purchased or leased.

236. Plaintiff and class members relied on Defendant's unfair, unlawful, and fraudulent business acts and practices to their detriment in that they would not have purchased or leased the Class Vehicles had BMW disclosed that the primary and secondary timing chain assembly were defective and the engines would fail

and for which performance BMW demanded and received a premium price. As alleged herein, Arat relied on Defendant's omissions and would not have bought the Vehicles had BMW disclosed the Defects.

237. Defendants' unfair, unlawful, and fraudulent business acts and practices directly and proximately caused Plaintiff' and Class members' injuries in that but for Defendant's failure to disclose that the Class Vehicles had a primary and secondary timing chain assembly defects, Plaintiffs and Class members would have paid less for the Class Vehicles, would have bought or leased other less-expensive styles or brands of vehicle, or would not have purchased or leased the Class Vehicles at all.

238. Defendants were obliged to disclose the material facts because: a) Defendant had exclusive superior knowledge of the material facts not known to Plaintiffs and Class members, since only Defendant had access to the aggregate data from its retailers, its own research and tests, and complaints from its customers, including, but no limited to, that information it obtained and or recorded in its warranty and customer service system and database(s); and b) Defendant actively concealed and suppressed the material facts from Plaintiffs and Class members by not warning of the Defect at the time of purchase and by performing warranty and/or repair work that it knew would not cure the Defect, while representing to consumers either expressly or impliedly that the

repairs it made, or which it caused its agents and contractors to make, would fix the Defect; (c) BMW made partial representations about the Vehicle's performance while withholding the material fact that the Vehicles have primary and secondary timing chain assembly defects that can cause catastrophic engine failure and prevents it from functioning properly and as represented.

239.   Plaintiff and Class members have suffered injury in fact and have lost money as a direct and proximate result of Defendant's unfair competition in that they have overpaid for the Class Vehicles and/or by the fact that their Class Vehicles are worth less than they paid for them because of the Defect.

240. Defendant was unjustly enriched and should be required to make restitution to Arat and the Class members pursuant to Sections 17203 and 17204 of the Business and Professional Code.

241.   Plaintiff and Class members seek an order of this Court awarding restitution, injunctive relief and all other relief allowed under Section 17200, *et seq.,* plus interest, attorneys' fees, and costs.

### TENTH COUNT

(Violations of Cal. Bus. & Prof. Code § 17500 *et seq.*)

242. Plaintiff Arat on behalf of himself and all others similarly situated repeat and re-allege all prior paragraphs and incorporate them as if fully set forth herein.

243. Plaintiff brings this cause of action on behalf of himself and the Class pursuant to California Business and Professions Code, §17500, *et seq*.

244. BMW is a "person" as defined by Cal. Bus. & Prof. Code § 17506.

245. BMW falsely advertised the Class Vehicles by making partial representations about their performance, while omitting the material information about the primary and secondary timing chain assembly defects.

246. BMW's false advertising through omission of material fact has deceived and is "likely to deceive" Plaintiff and Class members.

247. Plaintiff and Class members relied upon Defendant's false advertising to their detriment in that they would not have purchased the Class Vehicles had BMW disclosed that the primary and secondary timing chain assembly was defective, and therefore would lead to catastrophic engine failure.

248. Defendant's false advertising directly and proximately caused Plaintiff's and Class members' injuries in that but for Defendant's failure to disclose that the Vehicles had primary and secondary timing chain assembly defects Plaintiff and Class members would not have overpaid for the Class Vehicles, would have bought other less-expensive styles or brands of vehicles, or would not have bought the Class Vehicles at all.

249. Plaintiff and Class members have suffered injury in fact and have lost money as a result of Defendant's false advertising in that they have overpaid for the Class Vehicles, have experienced engine failure or loss of steering and other hazards while driving, and/or by that fact that their Class Vehicles are worth less than they paid for them because of the primary and secondary timing chain assembly defects.

250. Pursuant to Cal. Bus. & Prof. Code §§ 17203 and 17535, Plaintiff seeks an order 1) requiring Defendant to immediately cease the unlawful, unfair, and or fraudulent business acts and/or practices and false and misleading advertising complained of herein; 2) enjoining Defendant from continuing to falsely advertise the Class Vehicle; and 3) requiring Defendant to repair or replace the Class Vehicles or provide full restitution to Plaintiff and Class members of their full retail purchase price, plus interest and attorneys' fees.

## ELEVENTH COUNT

(Violations of the California Consumers Legal Remedies Act,Cal. Civ. Code § 1750 *et seq*.)

251. Plaintiff Arat on behalf of himself and all others similarly situated repeat and re-allege all prior paragraphs and incorporate them as if fully set forth herein.

252. Plaintiff seeks to enjoin Defendant's violation of the California Consumers Legal Remedies Act ("CLRA"), California Civil

Code §§1750 *et seq.*, as well as damages resulting from Defendant's violations of the CLRA.

253.  At all times relevant hereto, the Class Vehicles constituted "goods" as that term is defined in Civ. Code §1761(a).

254. At all times relevant hereto, Defendant constituted a "person" as that term is defined in Civ. Code §1761(c).

255. At all times relevant hereto Plaintiff and the Class Members are "consumers" or "persons" as defined by California Civil Code §1761(d).

256. At all times relevant hereto, Plaintiff's and Class members' purchases of Defendant's Class Vehicles and replacement parts constituted "transactions" as that term is defined in Civ. Code §1761(e).

257. At all times relevant hereto, Defendant provided "services" to Plaintiff within the meaning of Civil Code §1761(b).

258. The CLRA provides in relevant part that "[t]he following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful:(4)using deceptive representations . . .in connection with good or services (5) Representing that goods . . . have . . . characteristics, uses, benefits . . . which they do not have; ... (7) Representing that goods ... are of a particular standard, quality or grade . . . if they are of another; ...  and

(9) Advertising goods ... with intent not to sell them as advertised.

259. Defendant violated Civ. Code § 1770(a) subsection (4), (5), (7), and (9) by representing that Class Vehicles were not defective when, in fact, the Class Vehicles have primary and secondary timing chain assembly defects that cause engine failure. The information Defendant concealed and/or did not disclose to Plaintiff and Class members is material in that reasonable consumers expect vehicles, for which they paid a premium price, to function properly, and thus would have considered the omitted facts important in deciding whether to purchase or lease, or whether to pay the stated price for the Class Vehicles.

260. Defendant's unfair and deceptive acts or practices occurred repeatedly in Defendant's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

261. Defendant knew that the Class Vehicles suffered from an inherent defect, were defectively designed or manufactured, would fail prematurely, and were not suitable for their intended use.

262. Defendant was under a duty to Plaintiff Arat and the Class Members to disclose the defective nature of vehicles, as well as the associated costs that would have to frequently be expected in order to repair the Class Vehicles or replace the engines due to the Defect because, Defendant had exclusive

knowledge of the material facts not known to Plaintiff and Class members, since only Defendant had access to the aggregated collected from data from its retailers, complaints from its customers, including, but not limited to, that information recorded and accessible through its warranty and customer service database(s), communications with its service personnel, service personnel it authorized to make repairs to the Class Vehicles, and their own tests.

263. Defendant was in a superior position to know the true facts about the safety defect in the Class Vehicles relating to the Defect, Plaintiff Arat and the Class Members could not reasonably have been expected to learn or discover that the Class Vehicles had a dangerous safety defect until manifestation of the Defect; and Defendant knew that Plaintiff and the Class members could not reasonably have been expected to learn or discover the safety defect.

264. In failing to disclose the defective nature of the Class Vehicles, Defendant has knowingly and intentionally concealed material facts and breached its duty not to do so. Defendant actively concealed and suppressed the material facts from Plaintiff and Class members by not warning of the primary and secondary timing chain assembly defects at the time of purchase and by performing both warranty and non-warranty repairs that it knew would not cure the Class Vehicles or advising Plaintiff and

Class members to have their vehicles serviced to avoid catastrophic engine failure.

265. Plaintiff and Class members would have behaved differently by not buying the Class Vehicles, not paying for repairs, and/or paying less for the vehicles, had they been aware of the primary and secondary timing chain assembly defects.

266. The omissions of material facts, as alleged above, are contrary to representations actually made by Defendant, including but not limited to, the claim that BMW is "the ultimate driving machine."

267. Plaintiff and Class members justifiably acted or relied to their detriment upon the concealment and/or non-disclosure of material facts as evidenced by their purchases of the defective Vehicles. Had Defendant disclosed the material fact that the Vehicles had the primary and secondary timing chain assembly defects, Plaintiff and Class members would have behaved differently by not buying the Vehicles or paying substantially less for them.

268. Defendant's omissions of material facts directly and proximately caused Plaintiff's and Class member's injuries in that Plaintiff and Class members would not have paid the extra premium for the Class Vehicles or would not have bought the Class Vehicles at all had Defendant disclosed that the Class Vehicles primary and

secondary timing chain assembly were defective. As such, Plaintiff did not receive the benefit of the bargain.

269. As a direct and proximate result of Defendant's unfair and deceptive acts or practices, Plaintiff Arat and the Class Members have been harmed and have suffered actual damages in that the ClassVehicles are experiencing the Defect, causing inconvenience, creating a serious safety hazard, and causing Arat and Class Members to spend money.

270. As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Plaintiff Arat and Class Members have suffered and will continue to suffer actual damages.

271. Civil Code §1780 (a)(1) and (2) permits any court of competent jurisdiction to enjoin practices that violate Civil Code § 1770 and award damages and restitution.

272. Civil code §1780(a) provides that any consumer who suffers damages as a result of a CLRA violation may bring an action to recover: 1) actual damages, but in no case shall the total award of damages in a class action be less than $1,000, 2) an order enjoining the methods, acts, or practices, 3) restitution of property, 4) punitive damages, and 5) any other relief that the court deems proper.

273. Civil Code section 1781 provides that Plaintiff may pursue this case as a class action.

274. Arat has complied with Civil Code §1782(a) by sending a CLRA letter to BMW NA that listed all the violations of Civil Code section 1770. BMW NA did not make the corrections listed in the CLRA letter.

275. Arat and the Class members  are entitled to attorneys' fees pursuant to Civil Code section 1870(e), and to the other relief provided for by Civil Code section 1780(a).

## TWELFTH COUNT

*Asserted On Behalf of the California Class*
*(Breach of Express Warranty under the Song-Beverly Act,*
*Cal. Civ. Code 1790 et seq., and Cal. Comm. Code §2313)*

276. Plaintiff Arat on behalf of himself and all others similarly situated repeats and re-alleges all prior paragraphs and incorporate them as if fully set forth herein.

277. Plaintiff seeks recovery for himself and the Class for Defendant's breach of express warranty under the laws of the State of California.

278. Under its Written Warranty, Defendant warranted all of the Vehicles against "malfunctions or defects in materials or workmanship," and also offered an Extended Warranty at a time when it knew that the Vehicles had a primary and secondary timing chain assembly defects.

279. Defendant is obligated under the terms of its express Warranties to repair and/or replace the defective primary and

secondary timing chain assemblies or the engines where they have failed due to the Defect and/or to make the Class Vehicles conform to the Written Warranties and any Fact Warranties under the Song-Beverly Act, Civil Code § 1793.2(b) and (d), Cal. Comm. Code § 2313.

280. Defendant breached its Written Warranties and Fact Warranties, as set forth above, by selling and supplying the Class Vehicles with primary and secondary timing chain assembly defects and by failing to repair the Class Vehicles or replace them with non-defective Class Vehicles so that they conform to the warranties after a reasonable number of repair attempts.

281. To the extent any notice is deemed required, Defendant has received sufficient and timely notice of the breaches of warranties alleged herein. Defendant has had notice of Plaintiff's claim as it has attempted to repair Plaintiff's Vehicles. Despite this notice and Defendant's knowledge of the primary and secondary timing chain assembly defects, Defendant havs refused to honor its Written Warranties and Fact Warranties.

282. In addition, Defendant has received thousands of complaints and other notices from its customers throughout the United States, which complaints notified Defendant that the Class Vehicles are malfunctioning and have primary and secondary timing chain assembly defects.

283. Plaintiff has complied with his obligations under the Written Warranty and the law and has given Defendant a reasonable opportunity to cure the breaches of its Warranties and Defendant failed to do so.

284. Pursuant to Cal. Civ. Code § 1793.2, BMW had 30 days within which to conform Plaintiff's and Class member's Vehicles to the express warranties, however, BMW failed to do so and no conditions beyond its control prevented its compliance.

285. Defendant knew of its Warranty obligations to repair or replace the Class Vehicles, because of the defective primary and secondary timing chain assembly in the Class Vehicles that it could not conform to its express warranties. However, Defendant has willfully refused to replace the Class Vehicles.   Therefore, Defendant is liable for damages, as well as civil penalties pursuant to Civil Code § 1794.

286. BMW's time limits on its Written Warranties are procedurally and substantively unconscionable. The Written Warranties are offered on a take-it-or leave-it basis without any input from consumers in a "boiler-plate" printed form that are oppressive and surprise consumers because BMW is in a superior bargaining position. The Written Warranties are substantially unconscionable because BMW knowingly and/or recklessly sold a defective product that was defective at the time of sale, without conspicuously informing consumers about the Defect in the Class

81

Vehicles which cause them to malfunction or fail. The time limits on the Written Warranties are grossly inadequate to protect Plaintiff and Class members. The terms of the Written Warranties unreasonably favor Defendant by unreasonably limiting the Warranty; a gross disparity in bargaining power existed as between Defendant and Plaintiff and the Class members; Plaintiff and Class members had no meaningful choice in determining those time limitations; and Defendant knew or should have known that the Class Vehicles were defective at the time of sale and that the primary and secondary timing chain assembly defects would fail prematurely in the useful lives of the Class Vehicles, thereby creating overly harsh and one-sided results by leaving consumers with non-repairable Class Vehicles that BMW knew existed at the time of sale.

287. Defendant's affirmations and promises became part of the "basis of the bargains" between Plaintiff and the Class members, on the one hand, and BMW, on the other hand. Plaintiff and Class members would not have purchased the Class Vehicles had BMW not warranted the Class Vehicles as it did.

288. As a direct and proximate result of Defendant's breach of the Written Warranties and Fact Warranties, Plaintiff and Class members have sustained damages and other losses in an amount to be determined at trial.

289.  Pursuant to Cal. Civ. Code § 1793.2, BMW is required to replace the Class Vehicles with conforming vehicles, or reimburse Plaintiff and Class members their purchase price. Plaintiff and the Class members are also entitled to recover costs, attorneys' fees, and other relief as the Court deems appropriate.

### THIRTEENTH COUNT

*(Breach of Implied Warranty of Merchantability under the Song-Beverly Act, Cal. Civ. Code 1790 et seq.)*

290. Plaintiff Arat on behalf of himself and all others similarly situated alleges and incorporates the above allegations by reference as if fully set forth herein.

291. Under California's Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1792 *et seq.*, every sale of consumer goods is accompanied by both a "manufacturer's and retailer's" implied warranty that the goods are merchantable within the meaning of Cal. Civ. Code § 1791.1(a). Therefore, consumers need not be in privity with the manufacturer to bring an implied warranty claim.

292. Pursuant to Cal. Civ. Code § 1793, BMW's attempt to modify the length of the implied warranty of merchantability in its Written Warranty is void.

293. The Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

294. BMW is a "manufacturer" within the meaning of Cal. Civ. Code §§ 1791(j).

295. Plaintiff and the Class members bought the Class Vehicles at retail in the State of California.

296. At the time of sale, and currently, Defendant is in the business of manufacturing, marketing, and selling vehicles.

297. By operation of law, Defendant impliedly warranted to Plaintiff and Class members that the Class Vehicles, for which Plaintiff and Class members paid a premium price, were of merchantable quality and fit for the ordinary purposes for which they are used.

298. Defendant knowingly and/or recklessly sold a defective product without conspicuously informing consumers about the defective primary and secondary timing chain assemblies.

299. The Class Vehicles have an expected useful life of at least 150,000 years.  The primary and secondary timing chain assembly defects causes the Class Vehicles to malfunction and in some instances engine failure.  As a result, the Class Vehicles are substantially certain to fail within their useful life.

300. Defendant breached the implied warranty at the time of sale by selling the Class Vehicles with the primary and secondary timing chain assembly defects.

301. Plaintiff's and Class members' Vehicles do not pass without objection in the trade as they are sold as a premium product, but fail to drive for their expected useful life without malfunctioning.

302. Plaintiff's and Class members' Class Vehicles became unfit for their ordinary purpose.

303. Plaintiff's and Class members' Class Vehicles were not adequately labeled because the primary and secondary timing chain

assembly were defective and the Class Vehicles could not perform properly.

304. Plaintiff's and Class members' Class Vehicles do not conform to the promises or affirmations of fact made in the User Manual.

305. Plaintiff and Class members were the intended third-party beneficiaries of the contracts for sale of the Class Vehicles from BMW to the dealers who ultimately sold the Class Vehicles to Plaintiff and Class members across the State of California.

306. Defendant knew and intended that Plaintiff and Class members were the ultimate beneficiaries of Defendant's implied warranties as they are the owners of the Class Vehicles.

307. Plaintiff and Class members purchased the Class Vehicles from authorized BMW dealers who are agents of BMW.

308. BMW knew and intended that its authorized dealers of the Class Vehicles were not the ultimate consumers of the defective Class Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers and users of the Class Vehicles.

309. As a direct and proximate result of Defendant's breach of implied warranty, Plaintiff and Class members have sustained damages and other losses in an amount to be determined at trial. Plaintiff and Class members are entitled to recover damages and attorneys' fees as provided by statute, as well as costs, and other relief the Court deems appropriate.

E. Claims Brought on Behalf of the Wisconsin Subclass

FOURTEENTH COUNT

(Violation of Wisconsin Deceptive Trade practices Act, Wis.
Stat. §100.18 et. seq.)

310. Plaintiff Malske on behalf of himself and all others similarly situated alleges and incorporates the above allegations by reference as if fully set forth herein.

311. Plaintiff Malske and the other members of the Wisconsin subclass are consumers and members of the general public who purchased BMW's merchandise for their own personal use.

312. As detailed above, Defendant made untrue, deceptive, and misleading representations to the public with the intent to induce Plaintiff Malske and members of the sub-class to purchase Vehicles from BMW that they otherwise would not have purchased or would not have paid as much for but for Defendant's untrue, deceptive, and misleading representations regarding the superior nature of the Vehicles and their non-defective nature. These representations were material to the reasonable consumer and a significant factor involved in making the purchasing decision. As such, Defendant's untrue, deceptive, and misleading representations materially induced a pecuniary loss to Plaintiff and members of the sub-class. Defendant made these untrue, deceptive and misleading representations to the public prior to the existence of any relationship between Plaintiff and Defendant.

313. The WDTPA prohibits a seller from making deceptive, false, or misleading representations or statements of facts to prospective buyers.

314. The acts and practices of Defendant deceived Plaintiff and the members of the sub-class, and have resulted, and will result in, damages to the Plaintiff and members of the sub-class.

315. By committing the acts alleged above, Defendant has violated the WDTPA.

316. Plaintiff and the sub-class members suffered injuries caused by Defendant's misrepresentations because (a) they were induced to purchase a product they would not have otherwise purchased if they had known that BMW's merchandise was not defect-free and/or (b) they paid a price premium due to the false and misleading advertising and marketing of BMW's merchandise.

317. Plaintiff and the sub-class are entitled to, pursuant to Wis. Stat. §100.18 (11)(b), recovery of damages in the amount of the pecuniary loss suffered, together with the payment of costs and attorney's fees.

F.    Claims Brought on Behalf of the Oregon Subclass

FIFTEENTH COUNT

(Violation Of Oregon Unlawful Trade Practices Act)

318. Plaintiff Lash, on behalf of himself and all others similarly situated, alleges and incorporates the above allegations by reference as if fully set forth herein.

319. This claim is asserted on behalf of Plaintiff, Lash, and a sub-Class of all purchasers of Defendant's Vehicles with N20/N26 engines in Oregon.

320. Plaintiff Lash and the members of the sub-Class are individuals who have purchased Defendant's vehicles with N20/N26 engines having the primary and secondary timing chain assembly

defect in reliance upon the advertisements and product descriptions set forth above.

321. Defendant has engaged in unlawful practices under the Oregon Unlawful Trade Practices Act, ORS §646.638 because plaintiff has suffered an ascertainable loss of money or property, real or personal, as a result of BMW's willful use or employment of a method, act or practice declared unlawful by ORS§ 646.608.

321. Through uniform and omissions, BMW violated the Unlawful Trade Practices Act in one or more of the following ways:

      (d)      Failing to disclose known material defect or material nonconformities upon delivery of the Vehicles, in violation of §646.608(1)(t);

      (e)      Engaging in any other unfair or deceptive conduct in trade or commerce. §646.608(1)(u).

322. As a direct result of Defendant's violations of the Oregon Unlawful Trade Practices Act, Plaintiff and members of the sub-Class have suffered and continue to suffer actual damages in an amount which is presently unascertainable, but which will be determined from discovery prior to trial.

323. Pursuant to ORS §§646.638(1)(3)(8), Plaintiff seeks, on behalf of himself and the sub-class, actual damages or statutory damages (whichever is greater), attorney's fees, and equitable relief including an injunctive against BWW's unlawful or unfair acts and practices. Plaintiff and the members of the Class are entitled to an award of punitive damages for the willful,

wanton, and malicious practices by Defendant, in violation of the UTPA.

G. **On Behalf of the New York Subclass**

**SIXTEENTH COUNT**

**(Violations of New York General Business Law §349)**

324. Plaintiff Guy, on behalf of herself and all others similarly situated, alleges and incorporates the above allegations by reference as if fully set forth herein.

325. With regards to Plaintiff Guy and other members of the sub-Class who reside in New York, Defendant's conduct as alleged herein constitutes deceptive acts and practices in the conduct of a business, trade, or commerce or in the furnishing of a service in the State of New York in violation of N.Y. Gen. Bus. Law §349, et seq.

326. Defendant's conduct as alleged herein was directed at consumers such as Plaintiff, and members of the sub-Class, was consumer oriented misconduct that was misleading in a material respect to a reasonable consumer acting reasonably under the circumstances, and had a broad impact on consumers at large.

327. As a direct and proximate result of Defendant's conduct as alleged herein, consumers such as Plaintiff and members of the sub-class suffered actual damages in excess of $50 and including economic and financial losses. In particular, as a result of Defendant's deceptive acts, Plaintiff and the Class members have purchased Class Vehicles which have an undisclosed defective primary and secondary timing chain assembly which causes the vehicles to premature performance degradation and in many

instances catastrophic engine failure.   Had Defendant disclosed the Defect in the Vehicles, Plaintiff and the sub-class members would have behaved differently, by either paying less for the Class Vehicles or by not purchasing or leasing a Class Vehicle from BMW at all. Defendant's deceptive acts and practices as alleged herein were willful and knowing.

328. Plaintiff and members of the sub-Class are entitled to injunctive relief and should be awarded actual damages which should be trebled within the discretion of the Court.

329. Pursuant to N.Y. Gen. Bus. Law §349(h), Plaintiff Guy and her counsel will seek reasonable attorneys' fees, to be awarded within the discretion of the Court.

<u>SEVENTEENTH COUNT</u>

(Violations of New York General Business Law §349)

330. Plaintiff Guy on behalf of herself and all others similarly situated alleges and incorporates the above allegations by reference as if fully set forth herein.

331. With regards to New York consumers, Defendant's acts, practices and advertisement are of a recurring nature and were directed at consumers.

332. With regards to New York consumers, Defendant's acts, practices and advertisements are materially deceptive and misleading.

333. With regards to New York consumers, Plaintiff and the sub-class were injured as a result of Defendant's deceptive acts, practices and advertisements. As such, Plaintiff and the sub-class is entitled to be awarded actual damages which should be trebled

within the discretion of the Court, as well as, reasonable attorneys' fees, to be awarded within the discretion of the Court.

## EIGHTEENTH COUNT

**(Violations of New York's General Business Law §350)**

334. Plaintiff Guy, on behalf of herself and all others similarly situated alleges and incorporates the above allegations by reference as if fully set forth herein.

335. With regards to New York consumers, Defendant's advertisements were false and misleading in a material respect.

336. With regards to New York consumers, Plaintiff Guy and the sub-class have been aggrieved by Defendant's false advertising, as such, Plaintiff and the sub-class is entitled to be awarded actual damages which should be trebled within the discretion of the Court, as well as, reasonable attorneys' fees, to be awarded within the discretion of the Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs on behalf of themselves and on behalf of the Nationwide Class, New Jersey Subclass, Massachusetts Subclass, Texas Subclass, California Subclass, Wisconsin Subclass, Oregon Subclass and New York Subclass, prays for judgment against BMW North America, LLC and Bayerische Motoren Werke Aktiengesellschaft granting the following relief:

1.    Certification of the proposed Nationwide Class, New Jersey Subclass, Massachusetts Subclass, Texas Subclass, California Subclass, Wisconsin Subclass, Oregon Subclass and New

York Subclass and appointing Plaintiffs to represent the Classes and Plaintiffs' counsel as class counsel;

2.    All recoverable compensatory, statutory and other damages sustained by Plaintiffs and the other members of the Nationwide Class, New Jersey Subclass, Massachusetts Subclass, Texas Subclass, California Subclass, Wisconsin Subclass, Oregon Subclass and New York Subclass;

3.    Restitution and disgorgement of all amounts obtained by BMW as a result of its misconduct, together with interest thereon, from the date of payment, to the victims of such violations;

4.    Actual, treble, and/or statutory damages for injuries suffered by Plaintiffs and the other members of the Classes in the maximum amount permitted by applicable law;

5.    An Order, among other things: (1) requiring BMW to immediately cease its wrongful conduct, as set forth above; (2) enjoining BMW from further wrongful practices concerning the distribution, advertisement, marketing, warranting, sale and lease of the Vehicles; (3) requiring BMW to make all repairs and/or replacements necessitated as a result of the Defect in the vehicles purchased or leased by Plaintiffs and the other members of the Nationwide Class, New Jersey Subclass, Massachusetts Subclass, Texas Subclass, California Subclass, Wisconsin Subclass, Oregon Subclass and New York Subclass; (4) requiring BMW to refund to

92

Plaintiffs and all members of the Nationwide Class, New Jersey Subclass, Massachusetts Subclass, Texas Subclass, California Subclass, Wisconsin Subclass, Oregon Subclass and New York Subclass the funds they were forced to expend on repairs and/or replacements as a result of the Defect; and (5) a declaration that BMW is financially responsible for notifying all members of the Nationwide Class, New Jersey Subclass, Massachusetts Subclass, Texas Subclass, California Subclass, Wisconsin Subclass, Oregon Subclass and New York Subclass of the Defect, recalling the Vehicles and/or extending their warranties to cover the Defect;

6.    Statutory pre-judgment and post-judgment interest on the Class damages;

7.    Injunctive and declaratory relief;

8.    Payment of reasonable attorneys' fees and costs as may be allowable under applicable law; and

9.    Such other relief as the Court may deem just and proper.

<u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby demand a trial by jury on all causes of action so triable.

DATED: November 13, 2017        NAGEL RICE, LLP
                                *Attorneys for Plaintiffs and*
                                *the Putative Class*


                                By:    *s/ Bruce H. Nagel*
                                       Bruce H. Nagel

93

103 Eisenhower Parkway
Roseland, New Jersey 07068
973-618-0400
bnagel@nagelrice.com

Joseph Santoli, Esq.
340 Devon Court
Ridgewood, New Jersey 07450
201-926-9200
josephsantoli@aol.com